## The United States, appellants v. Juan Percheman, appellee.

Juan Percheman claimed two thousand acres of land lying in the territory of Florida, by virtue of a grant from the Spanish governor, made in 1815. His title consisted of a petition presented by himself to the governor of East Florida, praying for a grant of two thousand acres, at a designated place, in pursuance of the royal order of the 29th of March 1815, granting lands to the military who were in St Augustine during the invasion of 1812 and 1813; a decree by the governor, made 12th December 1815, in conformity to the petition, in absolute property, under the authority of the royal order, a certified copy of which decree and of the petition was directed to be issued to him from the secretary's office, in order that it may be to him in all events an equivalent of a title in form; a petition to the governor, dated 31st December 1815, for an order of survey, and a certificate of a survey having been made on the 20th of August 1819 in obedience to the same. This claim was presented, according to law, to the register and receiver of East Florida, while acting as a board of commissioners to ascertain claims and titles to lands in East Florida. The claim was rejected by the board and the following entry made of the same. "In the memorial of the claimant to this board, he speaks of a survey made by authority in 1829. If this had been produced it would have furnished some support for the certificate of Aguilar. As it is, we reject the claim." Held: that this was not a final action on the claim in the sense those words are used in the act of the 26th of May 1830, entitled "an act supplementary to," &c.

Even in cases of conquest, it is very unusual for the conqueror to do more than to displace the sovereign and assume dominion over the country.

The modern usage of nations, which has become law, would be violated; that sense of justice and of right, which is acknowledged and felt by the whole civilized world, would be outraged; if private property should be generally confiscated, and private rights annulled on a change in the sovereignty of the country. The people change their allegiance, their relation to their ancient sovereign is dissolved; but their relations to each other, and their rights of property remain undisturbed.

Had Florida changed its sovereign by an act containing no stipulation respecting the property of individuals, the right of property in all those who became subjects or citizens of the new government would have been unaffected by the change. It would have remained the same as under the ancient sovereign.

The language of the second article of the treaty between the United States and Spain, of 22d February 1819, by which Florida was ceded to the United States, conforms to this general principle.

The eighth article of the treaty must be intended to stipulate expressly for

[United States v. Percheman.]

the security to private property, which the laws and usages of nations would, without express stipulation, have conferred. No construction which would impair that security, further than its positive words require, would seem to be admissible. Without it, the titles of individuals would remain as valid under the new government as they were under the old. And those titles, so far at least as they were consummated, might be asserted in the courts of the United States, independently of this article.

The treaty was drawn up in the Spanish as well as in the English languages. Both are original, and were unquestionably intended by the parties to be identical. The Spanish has been translated; and it is now understood that the article expressed in that language is, that "the grants shall remain ratified and confirmed to the persons in possession of them, to the same extent," &c. thus conforming exactly to the universally received law of nations.

If the English and Spanish part can, without violence, be made to agree, that construction which establishes this conformity ought to prevail.

No violence is done to the language of the treaty by a construction which conforms the English and Spanish to each other. Although the words "shall be ratified and confirmed," are properly words of contract, stipulating for some future legislation, they are not necessarily so. They may import that "they shall be ratified and confirmed" by force of the instrument itself. When it is observed that in the counterpart of the same treaty, executed at the same time, by the same parties, they are used in this sense, the construction is proper, if not unavoidable.

In the case of Foster v. Elam, 2 Peters, 253, this court considered those words importing a contract. The Spanish part of the treaty was not then brought into view, and it was then supposed there was no variance between them. It was not supposed that there was even a formal difference of expression in the same instrument, drawn up in the language of each party. Had this circumstance been known, it is believed it would have produced the construction which is now given to the article.

On the 8th of May 1822 an act was passed "for ascertaining claims and titles to land within the territory of Florida." Congress did not design to submit the validity of titles, which were "valid under the Spanish government, or by the law of nations," to the determination of the commissioners acting under this law. It was necessary to ascertain these claims, and to ascertain their location, not to decide finally upon them. The powers to be exercised by the commissioners ought to be limited to the object and purpose of the act.

In all the acts passed upon this subject previous to May 1830, the decisions of the commissioners, or of the register and receiver acting as commissioners, have been confirmed. Whether these acts affirm those decisions by which claims are rejected, as well as those by which they are recommended for confirmation, admits of some doubt. Whether a rejection amounts to more than a refusal to recommend for confirmation, may be a subject of serious inquiry. However this may be, it can admit of no doubt that the decision of the commissioners was conclusive in no

[United States v. Percheman.]

case until confirmed by an act of congress. The language of these acts, and among others that of the act of 1828, would indicate that the mind of congress was directed solely to the confirmation of claims, not to their annulment. The decision of this question is not necessary to this case.

The act of 26th May 1830, entitled "an act to provide for the final settlement of land claims in Florida," contains the action of congress on the report of the commissioners of 14th January 1830, in which is the rejection of the claim of the petitioner in this case. The first, second and third sections of this act confirm the claims recommended for confirmation by the commissioners. The fourth section enacts "that all remaining claims, which have been presented according to law, and not finally acted upon, shall be adjudicated and finally settled upon the same conditions," &c. It is apparent that no claim was finally acted upon until it had been acted upon by congress; and it is equally apparent that the action of congress in the report containing this claim, is confined to the confirmation of those titles which were recommended for confirmation. Congress has not passed upon those which were rejected. They were, of consequence, expressly submitted to the court.

From the testimony in the case, it does not appear that the governor of Florida, under whose grant the land is claimed by the petitioner, exceeded his authority in making the grant.

Papers translated from a foreign language, respecting the transactions of foreign officers, with whose powers and authorities the court are not well acquainted, containing uncertain and incomplete references to things well understood by the parties, but not understood by the court; should be carefully examined, before it pronounces that an officer holding a high place of trust and confidence, has exceeded his authority.

On general principles of law, a copy of a paper given by a public officer, whose duty it is to keep the originals, ought to be received in evidence.

APPEAL from the superior court for the eastern district of Florida.

On the 17th of September 1830, Juan Percheman filed in the clerk's office of the superior court for the eastern district of Florida, a petition, setting forth his claim to a tract of land containing two thousand acres, within the district of East Florida, situated at a place called the Ockliwaha, along the margin of the river St John.

The petitioner stated that he derived his title to the said tract of land under a grant made to him on the 12th day of December 1815 by governor Estrada, then Spanish governor of East Florida, and whilst East Florida belonged to Spain.

The documents exhibiting the alleged title annexed to the petition were the following:

[United States v. Percheman.]

His excellency the governor:—Don Juan Percheman, ensign of the corps of dragoons of America, and stationed in this place, with due veneration and respect appears before your excellency and says, that in virtue of the bounty in lands, which, pursuant to his royal order of the 29th of March of the present year, the king grants to the military which were of this place in the time of the invasion which took place in the years 1812 and 1813, and your petitioner considering himself as being comprehended in the said sovereign resolution, as it is proved by the annexed certificates of his lordship brigadier don Sebastian Kindelan, and by that which your lordship thought proper to provide herewith, which certificates express the merits and services rendered by your petitioner at the time of the siege, in consequence of which said bounties were granted to those who deserved them, and which said certificates your petitioner solicits from your goodness may be returned to him, for any other purposes which may be useful to your petitioner: therefore, he most respectfully supplicates your lordship to grant him two thousand acres of land, in the place called Ockliwaha, situated on the margins of St John's river, which favour he doubts not to receive from your good heart and paternal dispositions. St Augustine, of Florida, 8th December 1815.

JUAN PERCHEMAN.

St Augustine, of Florida, 12th December 1815. Whereas this officer, the party interested, by the two certificates inclosed, and which will be returned to him for the purposes which may be convenient to him, has proved the services which he rendered in the defence of this province, and in consideration also of what is provided in the royal order of the 29th March last past, which he cites, I do grant him the two thousand acres of land which he solicits, in absolute property, in the indicated place; to which effect let a certified copy of this petition and decree be issued to him from the secretary's office, in order that it may be to him in all events an equivalent of a title in form.

ESTRADA.

PETITION. His excellency the governor:—Don Juan Percheman, sergeant of the squadron of dragoons of America, stationed in this place, with due veneration and respect appears before your excellency, and says, that in virtue of the royal

bounties in lands, granted by his majesty, by his royal order of the 29th of March of the present year, to the military individuals who were in this place aforesaid in the time of the invasion thereof, in the years 1812 and 1813, and your petitioner considering himself as included in the said royal resolution, as he proves it by the annexed certificates, exhibited with due solemnity, one of them from the brigadier Don Sebastian Kindelan, and the other with which your excellency thought proper to provide him, which certificates express the merits and services which he acquired and rendered in the time and epochs of the siege, in consequence of which the meritorious were thus rewarded, and which certificates your excellency will be pleased to return to your petitioner, for other purposes which may be useful to him, wherefore, your petitioner most respectfully supplicates your excellency to be pleased to grant him two thousand acres of land, in the place called Ockliwaha, situated on the margins of the river St John, which favour he doubts not to receive from the benevolent and charitable dispositions of your excellency. St Augustine, of Florida, on the 8th of December 1815.

JUAN PERCHEMAN.

DECREE. St Augustine, of Florida, on the 12th of December 1815. Whereas this officer interested proves by the two certificates annexed, and which will be returned to him for such purposes as may suit him, the services which he has rendered in the defence of this province, and also in consideration of the provisions of the royal order, under date of the 29th March last, which is referred to, I do grant to him, in absolute property, the two thousand acres of land, in the place which he indicates; for the attainment of which let a certified copy of this petition and decree be issued to him; which documents, will at all events serve him as a title in form.

ESTRADA.

I, Don Thomas de Aguilar, under-lieutenant of the army, and secretary for his majesty of the government of this place, and of the province thereof, do certify that the preceding copy is faithfully drawn from the original, which exists in the secretary's office, under my charge; and in obedience to what is

ordered, I give the present in St Augustine, of Florida, on the 12th of December 1815.

TOMAS DE AGUILAR.

PETITION FOR SURVEY.    His excellency the governor:—Don Juan Percheman, ensign of the corps of dragoons, and commandant of the detachment of the same, stationed in this place, with due respect represents to your excellency that this government having granted your petitioner two thousand acres of land in the place called Ockliwaha, on the margin of the river St John, he may be permitted to have the same surveyed by a competent surveyor, as soon and at any time your petitioner will find it convenient, which favour your petitioner hopes to receive from the high consideration of your excellency. St Augustine, of Florida, on the 31st December 1815.

JUAN PERCHEMAN.

St Augustine, 31st December 1815.    The preceding petition is granted.

ESTRADA.

I, Don Robert M'Hardy, an inhabitant of this province, and appointed surveyor by decree of this government, rendered on the 31st December 1815, in behalf of the interested party; do certify that I have surveyed for Don Juan Percheman, lieutenant of the Havana dragoons, a tract of land containing two thousand acres, situated on the south side of Ockliwaha, and is conformable in all its circumstances to the following plat. In testimony whereof, I sign the present in St Augustine, of Florida, on the 20th of August 1819.

RT. M'HARDY.

The petitioner proceeds to state that his claim to said tract of land so claimed by him was submitted to the examination of the board of commissioners appointed under and in virtue of an act of the congress of the United States of America, entitled " an act for ascertaining claims and titles to lands in the territory of Florida, and to provide for the survey and disposal of the public lands in Florida," passed the 3d day of March 1823.

And that the land so claimed by him, and situated, as aforesaid, within the territory of Florida, and within the jurisdiction

of this honourable court, as aforesaid, is embraced by the treaty between Spain and the United States of the 22d of February 1819; that his claim to said land has not been finally settled under the provisions of the act of the congress of the United States, entitled "an act supplementary to the several acts providing for the settlement and confirmation of private land claims in Florida," passed the 23d day of May 1828, or of anv of the acts to which the said last recited act is supplementary; and that the claim of the petitioner to the said land has not been reported by the said commissioners appointed under any of the said acts of congress, or any other, or by the register and receiver acting as such, under the several acts of the congress of the United States in such case made and provided, as antedated or forged, and that the said claim hath not been annulled by the aforesaid treaty between Spain and the United States, nor by the decree ratifying the same.

Wherefore he prayed that the validity of his claim to said land may be inquired into, and decided upon by the court, and that, in pursuance of an act of congress for that purpose, in that case made and provided, the United States be made a party defendant to this petition, and that process, &c. &c.

On the 2d of October the attorney of the United States for the district of East Florida filed an answer to the petition of Juan Percheman, in which it is stated, that on the 28th of November 1823, he, the said Juan Percheman, sold, transferred and conveyed, to one Francis P. Sanchez, all his right, title and interest in the tract of land claimed by him; which, the answer asserted, appeared by a copy of the conveyance annexed to the action, and that he had not, at the time of the filing of his petition, any right, title or interest in the land. The answer admits that the claim of the said Francis P. Sanchez to the said tract of land was duly presented to the register and receiver of the district, while they were acting as a board of commissioners to ascertain titles to land in East Florida, and avers that the said claim was finally acted upon and rejected by the said register and receiver, while lawfully acting as aforesaid, as appears by a copy of their report thereon, annexed to the answer.

The United States further say that the tract of land claimed

by the petitioner contains a less quantity than three thousand five hundred acres, to wit, but two thousand acres by the showing of the petitioner himself, and that the court has no jurisdiction in the case, nor can any court exercise jurisdiction over the claim against the United States.

The answer submits, that if the governor Estrada did make the grant or concession set forth by the petitioner at the time, "and in the manner alleged in the said petition or bill of complaint, he made it contrary to the laws, ordinances, and royal regulations of the government of Spain, which were then in force in East Florida, on the subject of granting lands, and without any power or authority to do so, and that the said grant was and is therefore null and void; and that the right and title to said tract of land, consequently, is vested in the said United States, as will more fully appear by reference to the laws, ordinances and royal regulations aforesaid."

The proceedings of the register and receiver in the claim of Francis P. Sanchez, referred to in the answer, were as follows:

"This is a certificate of Thomas de Aguilar, that, in December 1815, Estrada granted Don Juan Percheman, cornet of squadron of dragoons, for services, two thousand acres of land, at a place called Ockliwaha, on the St John's river. In 1819, Percheman sold to Sanchez. In the memorial of the claimant to this board, he speaks of a survey made by authority in 1819. If this had been produced it would have furnished some support to the certificate of Aguilar. As it is, we reject the claim."

The petitioner, by an amended petition filed on the 14th of December 1830, stated that the register and receiver of the United States for East Florida, in their final report on the land claims, transmitted on the 12th December 1828 to the secretary of the treasury, reported the claim of the petitioner as rejected on the ground that the claim depended on a certificate only of Don Thomas Aguilar, notary of the Spanish government in East Florida; and he averred that his claim depended on an original grant or file in the office of the public archives of East Florida, a certified copy of which is filed with the petition in the court, dated 8th December 1815.

The amended petition also states that the sale made by him

of the tract of land described in the original petition, was a conditional sale and no more.

It also states that the register and receiver further reported that the survey of the tract of land, made by the authority of the Spanish government, was not produced to them : but the petitioner avers the contrary, for that the survey was filed with the claim and was before them when they examined the same, for the truth of which averment a certificate from the keeper of the office of archives was filed with the amended petition.

On the hearing of the case before the supreme court for the district of East Florida, the claimant, by his counsel, offered in evidence a copy from the office of the keeper of public archives of the original grant on which this claim is founded; to the receiving of which in evidence the said attorney for the United States objected, alleging that the original grant itself should be produced, and its execution proved, before it could be admitted in evidence, and that the original only could be received in evidence : which objection, after argument from the counsel, was overruled by the court, and the copy from the office of the keeper of the public archives, certified according to law, was ordered to be received in evidence. And the court further ordered, that though by the express statute of this territory, copies are to be received in evidence, yet, in cases where either the claimant or the United States shall suggest that the original in the office of the keeper of the public archives is deemed necessary to be produced in court, on motion therefor, a subpœna will be issued by order of the court to the said keeper, to appear and produce the said original in court for due examination there.

The court proceeded to a decree in the case, and adjudged that the claim of the petitioner as presented was within its jurisdiction—"that the grant is valid, that it ought to be, and by virtue of the statute of the 26th of May 1830, and of the late treaty between the United States and Spain, it is confirmed."

The United States appealed to this court.

The case was argued by Mr Taney, attorney-general, for the United States ; and by Mr White, for the appellee.

[United States v. Percheman.]

For the United States it was contended :

1. That the copy of the grant and other proceedings produced by the petitioner, were not admissible in evidence, but the original papers ought to have been produced.

2. That the court had not jurisdiction of the case under the act of congress of May 26, 1830; the claim in question having been finally acted upon and rejected by the register and receiver.

3. If the court had jurisdiction of the claim, the suit could be maintained only by Francis P. Sanchez, to whom Percheman had conveyed his interest; and the court erred in confirming and decreeing the land to Percheman.

4. That if these points are against the United States, the authority exercised by the Spanish governor in making the grant to the appellee, was not within the royal order of the king of Spain.

As to the first point, the admissibility in evidence of certified copies of the grant and other proceedings, the attorney-general cited the act of congress of May 26, 1824, sect. 4, of May 23, 1828, and the Laws of Florida of July 3, 1823, sect. 4.

As to the second point, that the court had not jurisdiction of the case under the act of May 26, 1830, the claim having been finally acted upon and rejected; he cited the fourth section of that law. The acts of congress made the decision of the commissioners, and afterwards of the register and receiver, final in all cases under three thousand five hundred acres. For the correctness of this position he referred to the various provisions of the laws on the subject of the claims to lands in Florida, which are found in the first, fourth, fifth and sixth sections of the act of May 8, 1822 ; the second section of the act of March 3, 1823 ; the fourth and fifth sections of the act of February 8, 1827 ; and the fourth and sixth sections of the act of May 23, 1828. The language and provisions of all these laws, he contended, sustain the position that the decision of the register and receiver upon the claim of the appellee was final, as his claim was within three thousand five hundred acres.

The act of congress of May 26, 1824 gave jurisdiction to decide on all claims to lands in Missouri. In Arkansas the jurisdiction was confined to claims not exceeding one league

square.   No argument can therefore be drawn in favour of the jurisdiction in Florida from that given in Missouri.

The restrictive words in the act of 1828 are not in the act of 1824; and their introduction shows that the legislature, warned by experience, did not mean to give the same jurisdiction which it had given before.

Nor did the act of 26th May 1830 mean to extend the jurisdiction beyond that given by the law of 1828.   It uses strong words of restriction.   It refers to the jurisdiction given by the law of 1828, and not that given by the act of 1824.

It is said, that the act of 1830, section 4, would be nugatory according to this construction.   If that were the case, it would not alter the plain meaning of the words.

The legislature intended to provide for any cases which, in the various legislation on that subject, might, by possibility, be found not to have been finally acted on, and to supersede the necessity of further legislation.   The fact that no such case existed, and that there is nothing for it to operate on, and that there were no cases brought to the view of the legislature for which this section provides, cannot affect its construction.

Congress meant to provide for any unforeseen contingency, and any cases unknown or overlooked, which had not been finally acted on.

As to the third point, that if the court had jurisdiction, the claim could only be maintained by Francis P. Sanchez, it was argued, that the provisions of the act of 1824 required that the party having title must file the petition: the language of the section which gives the power to the commissioners to decide is, "to hear and determine all questions relative to the title of the claimants."   Thus, the title under which a claimant presents himself must be exhibited, and the decision of the commissioners, and afterwards of the register and receiver, must be upon the title.   The conveyance of the appellee to Sanchez was absolute; it gave him all the title and rights derived from the grant of the Spanish governor; it made him the legal owner of the tract of land described in the grant; and thus by him only, or by those holding under him, could a petition be presented under the provisions of the act of congress.

The petition of the appellee was a suit in chancery against

[United States v. Percheman.]

the United States, by a person who claims the title against every one else, and he must show his title, and establish it as a complete title, before he can be relieved. Cited, act of congress of 1824, sect. 6; act of 1830, sect. 4. How can land be decreed to one in a court of chancery, when it appears to the court that he is not entitled to it, and that another is the owner of it?

To sustain the position that governor Estrada was not authorized by the royal order of the king of Spain to make the grant to the appellee, it was argued, that the powers of the governor did not extend to the issuing of grants for so large a tract of lands as that claimed by the petitioner in this case. The royal order of March 29, 1815, White's Collection of Land Laws, 248; the letter of governor Kenderland to the captain-general of Cuba, White's Collection of Land Laws, 247, were cited. Also, The United States v. Arredondo, 6 Peters, 727, 728.

Mr White, for the appellee.

The appellee, who was petitioner in the court below, obtained a decree of confirmation to his claim of two thousand arpens of land in East Florida.

From that decree the United States have appealed, and the grounds upon which that appeal was taken, have been explained by the attorney-general. This case is one of great importance, because it involves a principle common to a number of others, and more especially because it concerns the honour and good faith of the government of the United States. The title set up by the petitioner, an officer in the service of the king of Spain, is admitted to be genuine.

It was made by the governor of East Florida, in pursuance of a royal order promulgated in 1815.

It was made to one of the officers, specially designated as a person intended to be benefited by the royal bounty which dictated the ordinance. The grant was made as a remuneration for services rendered by the claimant to the province at a time of great peril, occasioned by external invasion and internal insurrection. The grant was made prior to the limitation contained in the treaty, and was presented to the commissioners

appointed to ascertain claims and titles to land in East Florida. Upon this state of the facts presented on the record, three points will be submitted on the part of the appellee to the consideration of the court, and relied upon in support of the decree of the court below.

1. This title was confirmed by the treaty of the 22d of February 1819.

2. It is not competent for congress to pass any law authorizing any tribunal created under its authority to invalidate such a title.

3. By the act of 1830 this court has jurisdiction of the case. The first point involves the construction of the treaty. Whether is the eighth article executory or executed? This requires an examination into the article itself, and the negotiations which led to it.

By the treaty of the 22d of February 1819, Spain ceded the Floridas to the United States.

The latter acquired these provinces and their appendages in full sovereignty, including all public grounds and edifices, and all vacant lands which were not private property. Article 2d.

It was stipulated between the high contracting parties that all grants made by his catholic majesty, or his lawful authorities, before the 24th of January 1818, in the ceded territory, should remain confirmed and acknowledged, in the same manner as they would have been if the provinces had continued under the dominion of his catholic majesty. Article 8th. Further time was given to proprietors who had been prevented from fulfilling the conditions of their grants by the recent circumstances of the Spanish monarchy, and the revolutions in Europe.

The inhabitants of the ceded territory were protected in all their rights, and became citizens of the United States. Articles 5th and 6th.

Congress has, from time to time, adopted various legislative provisions for the purpose of preserving the national faith, separating private property from the public domain, and securing the individual titles intended to be protected by the treaty.

Commissioners were appointed to examine land claims, with authority to confirm grants not exceeding a certain size, and

to report those above that limit to congress.    When these commissions were dissolved, similar powers were vested in the register and receiver of the land offices.    In some instances, an option was given to the holders of certain grants to select a league square within their respective concessions, upon condition of surrendering the residue by deed to the United States. Through these and other means, the titles of the smaller proprietors have, for the most part, been definitively adjusted, and the larger claims alone remain for settlement.    These, congress, by act of 23d May 1828, authorized the courts of the territory to hear and determine, with an appeal to the supreme court of the United States.    Several cases have been adjudicated in the courts below. . Decisions have been pronounced, not easily reconcilable, if not at total variance with each other: appeals have been taken, and the questions discussed are now before this court, whose judgment is deeply interesting, not merely to the parties on the record, but to the numerous other suitors whose rights, or supposed rights, depend on similar principles.

One or two considerations of a general nature may here, it is presumed, be not inappropriately introduced. Those who represent the interests of the United States in some of the cases before the court, have thought proper to assume, as one ground of defence, that the confirmation or rejection of these titles is matter essentially of executive or legislative cognizance, and addresses itself exclusively to their discretion.    The question they urge is a political, not a judicial one, and is equally unfit to be submitted to, and incapable of being decided by a court. Waiving all considerations of the hardship and mockery of referring claimants under a treaty to a tribunal-incompetent to afford them redress—forbearing to touch on the indecorum of a construction which attributes to congress an act of futile or deceptive legislation—it will be enough to say that this interpretation, it is believed, has been once considered and rejected. Soulard's case, 4 Peters, 511.

The argument, indeed, amounts to little more than this— we have bound ourselves to do what Spain would have done. What that is, we know not: and having referred the question to those who cannot decide it, we will therefore do nothing.

Perfidy often wears the mask of subtlety, as well from shame as cowardice: but it is seldom that the counsellors of bad aith, if they condescend to argue at all, are satisfied with a defence so feeble.

The act of congress requires the court to examine and decide upon these claims in conformity with the law of nations, the treaty, and the laws of Spain.

It is proposed to consider the subject in reference to each of these several rules of decision.

1. The law of nations.

It is conceived that, according to the mitigated rights of war, as now well understood and settled by international law, the lands of individuals are safe even after conquest, Vattel, b. 3, c. 13, sect. 200: much less can a cession, of itself, destroy private rights. Absolute or perfect grants, it is believed, would be protected by the law of nations, independent of the treaty. Some legislative recognition of their validity might indeed be necessary to sustain a suit upon them in our courts, but the national obligation to respect them could hardly be denied. It is in behalf of concessions or inchoate grants that the stipulations of the treaty were most requisite and important. To the acts of the Span sh government in this respect, not merely the authority of res adjudicata, such as belongs to all foreign sentences and decrees, was given by the treaty; its effect was to make binding on us, all that would have been valid against Spain; and to oblige us to complete whatever she, in good faith, had begun, but left unfinished.

A detailed examination of the maxims of customary international law, as they would bear upon the rights of proprietors of land in Florida, is not called for in the presence of an express treaty stipulation; and, in referring to the law of nations as a rule of decision for the courts, congress perhaps had more expressly in view such part of it as relates to the interpretation of treaties. This will be more conveniently considered under another head.

2. The treaty.

This instrument, it is contended, should be most liberally construed. Its interpretation is to be sought in the motives and policy of the parties; in their words, and in their acts.

[United States v. Percheman.]

The leading objects of the United States were, to procure a more convenient and secure frontier; to command the Gulf of Mexico, the outlet of a large portion of their commerce; to obtain indemnity for their merchants, and to secure themselves against the annoyance they must naturally expect from Florida, in the hands of an enemy, or a false or feeble neutral. It is notorious that for more than a century this territory had been a constant source of injury, jealousy, and vexation to the adjoining colonies and states. The colony of Georgia was founded as a barrier against the encroachments of the Spaniards; and the refuge and encouragement afforded by the latter to absconding slaves, hostile Indians, and other incendiaries, was a continued cause of complaint, from the settlement of Carolina to the Seminole campaign. In examining the interests and duties of the United States in connexion with this subject, it is not as landed proprietors alone that we must regard them. The rage for new settlements, indeed, makes this the chief point among the people, and greatly increases the prejudices against the large grants; but the court is far above the contagion of their example.

To consider the cession of Florida merely as a land-jobbing transaction, would be doing great injustice to the liberal and enlightened policy which sought this valuable acquisition, with steady calmness, through so long a course of evasion and delay. Yet its value even in that point of view is not unworthy of notice. Thirty-five millions and a half of acres, of which up to the 30th of June 1828, but little more than a million and a half had been granted or sold, (Reports of Committees, H. R. No. 95, 2d session 20th congress), will surely, after making a most liberal allowance for the satisfaction of unsettled land claims, more than refund to us the five millions paid to our own merchants. Computing but thirty millions at the minimum price to which it is proposed to reduce the refuse lands, the United States will receive back their principal from the soil, and obtain the sovereignty for nothing.

It is admitted that, in the cession of a province, the disposition of the inhabitants and their effects is a question of policy between the parties. To divest them of their rights of property is, however, in modern times, an unheard of cruelty. Usually

[United States v. Percheman.]

the option is allowed them of becoming subjects of the new government, or of selling their estates, and removing within a specified period. Such were the terms of cession of this very province from Spain to Britain in 1763; and from Britain to Spain twenty years afterwards. It will be borne in mind by the court that population rather than land is the want of the United States; that their policy as to naturalization is as liberal as that which the wisest modern philosopher has praised in the greatest of the ancient republics; and that sovereignty, not soil, was the great motive for the acquisition.

Our government, it may safely be affirmed, neither contemplated the expulsion of the ancient inhabitants, nor any injury to their property. The terms held out in the treaty ceding Louisiana, as well as that by which Florida was acquired, show that the United States never intended to grasp a barren sceptre, and wave it over a dispeopled territory. The inhabitants were made citizens. The province was to become a state. Can it be imagined that any rational government would act so unwisely, as to receive into their society a large body of foreigners, endow them with civil rights and political power; and, after rendering them disaffected, by stripping them of their property; leave to these malcontents the protection of an extensive, important, and exposed frontier?

Many of the motives which must have operated on Spain are equally obvious. She naturally wished to extinguish demands, the justice of which had been admitted, while their satisfaction had been evaded until all the arts of procrastination were exhausted. She might desire to get rid of a useless and expensive appendage; and she must have foreseen that it would probably be wrested from her as an indemnity, if she trifled much longer with our patience. But, in yielding up the inhabitants with the territory, she would naturally stipulate most favourably for the people she was about to surrender. She did not intend to sacrifice them. Their fidelity to her in every vicissitude; the temptations by which they had been assailed; the invasions to which they had been exposed; their sufferings, their constancy, their very helplessness, all pleaded powerfully in their favour.

In the eighth article, two parties were stipulating for the

security and advantage of a third, whom both had the strongest reasons to cherish and protect. It is submitted, therefore, with some degree of confidence, that, so far as the motives and policy of the parties afford a key to the meaning of their words, the construction most favourable to the claimants is permitted to, nay, is enjoined upon the court.

Before proceeding to examine the language of the treaty, a few observations on the rules of interpretation may, perhaps, be pardoned. Jurists generally admit that all grants, contracts, and stipulations are to be taken most strongly against the grantor. Cooper's Justinian, in note, 601. The words of the party promising are to be regarded rather than those of the party to whom the promise is made. Vattel, b. 2, c. 17, sec. 267. Other general rules are to be found in the works of the most esteemed publicists, and must be familiar to the court. Grotius, b. 2, ch. 16, p. 136. Vattel, b. 2, ch. 17, sec. 270. Among the rest, that interpretation which is drawn from the reason of the act is strongly and safely recommended. Vattel, b. 2, c. 17, sec. 287. A special rule of construction has, moreover, been deduced from the character of the stipulation itself. Hence the distinction between things favourable and things odious—a distinction recognized by Grotius and Vattel. Grotius, b. 2, ch. 16, sec. 10, p. 148. Vattel, b. 2, ch. 17, sec. 300, 301, 303. The difference between the former, and mere acts of liberality prejudicial to the sovereign, is illustrated by the last named author, (Vattel, b. 2, ch. 17, sec. 310), in such a manner as leaves no doubt to which class the provisions of the eighth article belong.

What, indeed, can be more clearly entitled to rank among things favourable than engagements between nations securing the private property of faithful subjects, honestly acquired under a government which is on the eve of relinquishing their allegiance, and confided to the pledged protection of that country which is about to receive them as citizens?

This brings us to the words of the treaty. There is a difference between the English and the Spanish versions of the eighth article. Both are equally originals, but surely the justice and liberality of the United States will extend to the claimants the full benefit of either. The first difference is in render-

ing "*concesiones de terrenos*" as "grants of land." *Concesiones,*
it is apprehended, is a term much broader than *grants,* and
comprehends all which we, in the technical language of our
land laws, might call entries or warrants of survey or location.
The substitution of *lawful,* in the English, for *legitimos,* in the
Spanish, will be commented on in another place. The residue
of the clause, that those grants *shall be* ratified and confirmed
to the persons in possession of *the lands,* to the same extent that
the same grants would be valid, &c. is by no means equivalent
to the Spanish phraseology. The latter, fairly rendered, is to
this effect: "All concessions of lands made by his catholic
majesty, or by his legitimate authorities, before the 24th Janu-
ary 1818, in the aforesaid territories, which his majesty cedes
to the United States, shall remain confirmed and acknowledged
to the persons in possession of them (i. e. the concessions), in
the same manner that they would have been if the dominion
of his catholic majesty over these territories had continued."

The difference between declaring that these *grants shall be*
ratified and *confirmed* to the persons in possession *of the lands,*
to the *same extent* that the *same grants* would have been valid,
&c., and saying that all *concessions* of land shall *remain con-
firmed* and *acknowledged* to the persons in possession *of them*
(i. e. the title papers), in the *same manner that they would* have
been, &c., is sufficiently obvious and important. The sense is
materially different. The English side of the treaty leaves the
ratification of the grants executory—*they shall be ratified;* the
Spanish, *executed*—they shall *continue acknowledged* and con-
firmed, *quedaran ratificados.* *Quedan* signifies remain or con-
tinue, and in this sense is used in the last clause of the same
article—*quedan anuladas y de ningun valor,* remain null and o.
no effect. In the English, possession refers to the *lands;* in
the Spanish, to the *grants.* The relative *ellas* agrees with the
antecedent *concesiones;* if it referred to *terrenos,* the relative
would have been *ellos.* No word equivalent to recent is to be
found in the Spanish.

It has been supposed, with little reason, that the eighth
article might be interpreted to confer a discretion, rather than
impose an obligation on the American government. It is one
of the admitted rules of construction, that interpretations which

lead to an absurdity, or render an act null, are to be avoided. Vattel, b. 2, ch. 17, sec. 282, 304.

The king of Spain can annul a grant made by himself without any allegation of surprise or fraud, simply in virtue of his absolute will and sovereign power. It is too late for us to deny that position ; we have recognized it by the treaty. The grants to Alagon, Vargas, and Punon Rostro were annulled. By the treaty we succeed to all the rights of Spain : the concessions made by Spain are to continue valid to the same extent, &c. : but will it be asserted that, in succeeding to the rights of Spain, we succeed to the right of his catholic majesty to annul the grants of his subjects? Can it be pretended that the provisions of the eighth article were designed only to leave all grants, perfect and inchoate, as completely at the mercy of the American government as they had been at that of the Spanish monarch?

In attempting to ascertain the true meaning of the parties, it is humbly conceived we are not confined to the language of the treaty. We may look into the negotiations which preceded it. In this instance, there is a particular propriety in doing so. " As the instrument of ratification, an essential part of the whole treaty refers to the history of the negotiation : it lets in the whole of that history, as matter to be adverted to, according to all the strictness of legal argument, in reasoning on the construction of the claim in question. The matter is thus made capable of being argued as if the question were upon an act of parliament, or private deed reciting the circumstances under which it was obtained. One might, therefore, rest, as elucidating the case, upon all the authorities which establish, with respect to private and diplomatic instruments, that, however general and comprehensive particular expressions may be, they ought, in their effect, to be confined to the particular object the parties had in view. The reports of the court of chancery in England contain a variety of instances as to the restriction of deeds, however widely expressed, to the particular object of the parties, founded on a review of the circumstances under which they were made. (Vide Cholmondly and Clinton.) It is also observed by Vattel (268), that we are to interpret a clause in the utmost latitude that the strict

and appropriate meaning of the words will admit of, if it appears that the author had in view every thing which that strict and appropriate meaning comprehends · but we must interpret it in a more limited sense when it appears probable that the author did not mean it to extend to every thing which the strict propriety of the terms might be made to include." MS. Opinion of sir John Joseph Dillon on Rattenbury's grant.

A short sketch of the negotiations, with some brief extracts and references, will therefore be submitted. In January 1818 the government of the United States proposed to the Chevalier de Onis to terminate all differences in the following terms

1. Spain to cede all territory eastward of the Mississippi.

2. The eastern boundary to be the Colorado.

3. Claims for indemnities to be referred to commissioners.

4. The lands in East Florida, and to the Perdido, to be held as security for the indemnities; but no grant subsequent to August 11, 1802, to be considered valid.

5. Spain to be released from the payment of the debts.  Lyman's Diplomacy U. States, vol. 2, p. 133.

On the 24th October 1818, Don Luis de Onis proposes to cede the Floridas: " the donations or sales of land made by the government of his majesty, or by legal authorities, until this time, are nevertheless to be valid." 1 Executive Papers, 1st sess. 16th cong. 1819, 1820, doc. 2, p. 25.

The secretary of state replies, October 31, 1818, "neither can the United States recognize as valid all the grants of land until this time, and at the same time renounce all their claims for indemnity." He adverts to the notice given to the government of Spain, that all the grants lately made within those territories (i. e. to Alagon, Vargas, &c.) must be cancelled, unless some other adequate fund should be provided to satisfy the claims of the United States and their citizens. 1 Executive Papers, 1st sess. 16th cong. 1819, 1820, doc. 2, p. 25.

De Onis rejoins, 10th November 1818, " my second proposal has been admitted by your government, with this modification, that all grants and sales of land made by his catholic majesty, or by lawful Spanish authorities in the Floridas, from the year 1802 to the present, shall be null and void.  To this modification, in its absolute sense, I cannot assent, in as much

as it is offensive to the dignity and imprescriptible rights of the crown of Spain; which, as the legitimate owner of both the Floridas, had a right to dispose of those lands as it pleased: and, further, as the said modification would be productive of incalculable injury to the bona fide possessors, who have acquired, settled, and improved those tracts of land." ·

· " The extent of what I can agree to is, that the late grants made by his catholic majesty in the Floridas since the 24th of January last, the date of my first note, announcing his majesty's willingness to cede them to the United States (the said grants having been made with a view to promote population, cultivation and industry, and not with that of alienating them), shall be declared null and void, in consideration of the grantees not having complied with the essential condition of · the cession, as has been the fact." 1 Ex. Papers, 1st sess. 16th cong. doc. 2, p. 26.

On the 9th of February 1819, the minister of Spain submitted his project of a treaty. The ninth article, answering to the eighth of the present treaty, is as follows:

"All grants of lands made by his catholic majesty, or his legitimate authorities, in the aforesaid territories of the two Floridas, and others which his majesty cedes to the United States, shall be confirmed and acknowledged as valid, excepting those grants which may have been made after the 24th of January of last year, the date that the first proposals were made for the cession of those provinces, which shall be held null, in consideration of the grantees not having complied with the conditions of the cession." 1 Ex. Papers, 1st sess. 16th cong. doc. 2, p. 37.

On the 13th of February 1819, the American secretary offered his counter project, in which the eighth article proposed stands thus:

· " All grants of land made by or in the name of his catholic majesty in the aforesaid territories, after the 24th of January 1818, shall be held null, the conditions of the said grants not having been performed by the grantees. All grants made before that date by his catholic majesty, or by his legitimate authorities in the said territories, the conditions of which shall have been performed by the grantees according to the tenor of

[United States v. Percheman.]

their respective grants, and none other, shall be confirmed and acknowledged as valid." 1 Ex. Papers, 1st sess. 16th cong. doc. 2, p. 43.

In the minute or protocol of conferences preserved by M. Hyde de Neuville, whose good offices were interposed on this occasion, the following entry will be found:

" *Article eighth.* This article cannot be varied from what is contained in the chevalier's project, as the object of the last clause therein is merely to save the honour and dignity of the sovereignty of his catholic majesty.

" *Note of Mr Adams thereon.* Agreed, with the following explanation : that all grants of land which shall not be annulled by this convention are valid to the same extent as they are binding on his catholic majesty.

" *Remarks of M. De Neuville.* The secretary of state observed to me, that the federal government would, most assuredly, never entertain the idea of disturbing individuals who were vested with a bona fide title to their property ; but, as a treaty ought not to cover fraudulent practices, so no more could be asked of the United States than could be offered by his catholic majesty that, being in this case substituted for his majesty, they would scrupulously fulfil their engagements, but that more could not be expected of them.

" The secretary of state even proposes, if M. De 'Onis wishes it, that the article shall be inserted in the treaty as proposed by the minister of Spain, on condition that the above explanation shall be given in the form of a note. The federal government, unwilling to leave any thing in a state of doubt or uncertainty, only wish to place on the most secure footing whatever is just and honourable, and is at the same time perfectly satisfied that his catholic majesty neither asks nor wishes more." 1 Ex. Papers, 1st sess. 16th cong. doc. 2, p. 48.

The eighth article was finally inserted as it at present stands; but doubts arising whether the recent large grants were effectually excluded by the words of the treaty, Mr Adams writes to the Chevalier De Onis on the 10th March 1818, that it was distinctly understood that the grants to Alagon, Vargas and Puñon Rostro, were all annulled by the treaty, as much as if they had been specifically named, and that they will be so

held by the United States. 1 Ex. Papers, 1st sess. 16th cong. doc. 2, p. 63.

Mr Adams, on the 14th July 1819, submits to M. De Neuville the following observations on the eighth article : " M. De Neuville's particular attention is requested to the difference between the two projected articles, because it will recall particularly to his remembrance the point upon which the discussion concerning this article turned. By turning to the written memorandum, drawn up by M. De Neuville himself, of this discussion, he will perceive he has noted that M. De Onis insisted that this article could not be varied from what was contained in the chevalier's project, as the object of the last clause therein was merely to save the honour and dignity of the sovereignty of his catholic majesty."

It was then observed by Mr Adams, that the honour and dignity of his catholic majesty would be saved by recognizing the grants prior to the 24th of January, as " valid to the same extent as they were binding on his catholic majesty ;" and he agreed to accept the article as drawn by M. De Onis, with this explanation. (See M. De Neuville's memorandum.) It was on this occasion that M. De Neuville observed, that, if the grants prior to January 24, 1818, were confirmed only to the same extent that they were binding on the king of Spain, there were many bona fide grantees, of long standing, in actual possession of their grants, and having actually made partial settlements upon them, but who had been prevented by the extraordinary circumstances in which Spain had been situated, and the revolutions in Europe, from fulfilling all the conditions of their grants ; that it would be very harsh to leave these persons liable to a forfeiture, which might indeed, in rigour, be exacted from them, but which very certainly never would be, if they had remained under the Spanish dominion. It will be remembered by M. De Neuville how earnestly he insisted upon this equitable suggestion, and how strongly he disclaimed for M. De Onis every wish or intention to cover, by a provision for such persons, any fraudulent grants. And it was then observed by M. De Neuville, that the date assumed, of 24th of January 1818, was not sufficient for guarding against fraudulent grants, because they might be easily antedated. It was with refer-

ence to these suggestions of M. De Neuville, afterwards again strenuously urged by M. De Onis, that the article was finally modified as it now stands in the treaty, declaring all grants subsequent to 24th January 1818, absolutely null, and those of prior date valid to the same extent only that they would have been binding on the king; but allowing to bona fide grantees, in actual possession, and having commenced settlements, but who had been prevented by the late circumstances of the Spanish nation, and the revolutions in Europe, from fulfilling all the conditions of their grants, time to complete them. The terms of the article accord precisely with the intentions of all the parties to the negotiation, and the signature of the treaty. If the dates of the grants are subsequent to the 24th of January 1818, they are annulled by the date; if prior to that date, they are null, because not included among the prior grants confirmed.     1 Ex. Papers, 1st sess. 16th cong. pp. 68, 69.

From all these documents, the clear inference is, that the great subject of anxiety with our negotiator was the large grants to Alagon, Vargas, and Punon Rostro. It was against them almost alone that the article was directed.     The American government, indeed, at one time, proposed to carry the date back to 1802, by which means they would have excluded the claims of Forbes, Arredondo, and others, with whose existence there is *every reason to believe* they were perfectly well acquainted. But this pretension was speedily abandoned.     If there appeared a distinct declaration on the part of the American government that the sole object of the eighth article was to exclude the grants to Alagon, Punon Rostro, and Vargas, such declaration, it is apprehended, would be conclusive.     It could no longer be deemed just or honourable to apply the question ordinary and extraordinary to other grants, dated before the 24th January 1818, with a view of extorting from them by legal subtlety something which should debar their proprietors the benefits of that very article which was framed solely to admit them, and to exclude others.     Yet, it is respectfully submitted, that no express admission of the fact could be stronger than the implication arising from this correspondence.     If, however, an explicit avowal on the part of our government will alone be received, we refer to the message of the president to congress, in which

he tells that body, "it was the intention of the parties to annul these latter grants, and that clause was drawn for that express purpose, and none other." 1 Ex. Papers, 1st sess. 16th cong. 1819, 1820, doc. 2, p. 5.

May we not ask whether this is the sole purpose to which it is now sought to be applied, and how far it is consistent with justice and good faith to extend the effect of the clause in question beyond what either of the parties contemplated at the time of its adoption ?

The application of the common law principle, that a grant may be absolutely void where the officer issuing it had no authority, is insisted on : and it is asserted that the royal governors of the Spanish colonies had no power to make sales or donations of the public lands, except in very limited quantities and under numerous restrictions. An inquiry into the truth of this assertion will be attempted, according to the limited means within our power ; and the more readily because of the intimations thrown out by this court in the cases of Soulard and Smith. 4 Peters's Reports.

Every fair presumption is against these supposed limitations. Legal or constitutional restrictions upon the power of the king or his officers, according to our ideas of them, are inconsistent with the character of the Spanish monarchy. They are hardly comprehensible by a native of that country, and have been rejected, together with the constitutional monarchy, by the people of Spain. How is it possible to reconcile limitations of power with the fundamental maxim, "the will of the prince has the force of a law ?"

Portions of the royal authority, as arbitrary as that of the king himself, were entrusted to the several governors of provinces, each of whom, within the limits of his own government, was the image of his sovereign, and, in practice at least, and in popular opinion also, absolute. The only restraints upon his acts were his instructions, and accountability to the king ; but the royal instructions, and the *residencia*, or account of his transactions, which the governor was obliged to give, were not properly legal limitations upon his power, but rather directions for the exercise of his discretion, and securities for his good behaviour.

Every nation has its own manner of securing the fidelity of its agents. Free governments are constructed upon the principle of entrusting as little power as possible, and providing against its abuse *preventively* by all species of checks and limitations. Arbitrary ones proceed upon the principle of bestowing ample powers and extensive discretion, and guarding against their abuse by prompt and strict accountability and severe punishment. Both have been invented by mankind for purposes of mutual defence and common justice, but the pervading spirit of the one is *preventive*, of the other *vindicatory*.

How absurd would it be, then, to apply the maxims of the one government to the acts of the other. As well might we judge the life of Pythagoras by the law of the New Testament, or the philosophy of Zoroaster by that of Newton; as subject the administration of a Spanish governor to the test of magna charta, the bill of rights, the habeas corpus act, or the principles of American constitutional law.

Even the laws of the Indies, obscure, perplexed, and sometimes even unintelligible as they are, hardly reached across the ocean; and the decline of the Spanish, like that of the Roman empire, was marked by the *absolutism* of the distant prefects.

Nor were the offices of captain general, intendant or subdelegate, sinecures. Entrusted with the command and defence of remote and exposed possessions; often reduced to the greatest extremities, for the want of money and supplies; neglected by the feeble government of the mother country, they were yet expected to guard the colony, and execute the most rigorous system of monopoly, amid greedy neighbours and an impoverished people. They were frequently obliged to create their own resources; and some idea of their difficulties, and the devotion and address which surmounted them, may be formed by remembering how long the able but cruel Morilla protracted a desperate warfare, amid every species of distress and destitution.

Their first duty was to preserve his catholic majesty's province, committed to their care; and if they did it, and could only do it by some invasions of the fisc, or dilapidations of the royal domain; does it lie with us to complain of their fidelity to

him, and vitiate those titles which were devised from a law above all others—necessity ? Vide White's Land Laws, 235; 7 Ex. Doc. p. 2, 1824, 1825. Also, MS. Extracts from Col. M'Kee's Correspondence., See also the letter of Gov. Chester to the Earl of Dartmouth, MS. Letter Book, West Florida, 18th Nov. 1775, p. 34.

This general outline of the treaty, the negotiations which led to it, the objects of the contracting parties, cannot fail to be considered by the court in the adjudication of every case presented to it. If it be considered, as it has been proved and admitted in part in another case decided at the last term, that the treaty itself operated as a confirmation of every legitimate and valid title which " emanated from his catholic majesty, or his lawful authorities prior to the 24th of January 1818 ;" it only remains to be shown that this was such a title.

Juan Percheman was an officer in the Spanish service at the period of the invasion of that province in 1812, 1813. He was referred to by name in the royal despatch, and this grant was made in absolute property to him as a remuneration for his services.

How is it attempted by the government agents to defeat so just and equitable a claim ? The first ground taken is, that " the copy of the grant is not admissible evidence ; but the *original* ought to have been produced and proved."

This involves the question, what is *a copy*, and what an original, under the Spanish government ; as defined by the Spanish laws. This is a paper certified by the escribano of government to be a full copy of the petition and decree of the governor of East Florida. It is, in fact, the original grant. The petition and decree of the governor are preserved in the office of the escribano, are placed there in paper books as composing the *dilligencias* of his office.

These papers never go out, any more than the notes of the surveyors, upon which a grant issues in the United States. In this country the original patent, signed by the governor or president, is delivered to the patentee, and the copy is retained in the office. Now, if we are asked why this is so, the answer is, " ita lex scripta est." It is the law and the custom of Spain and her provinces ; and it would be as reasonable to ask, why

has she not adopted the common law of England? The decree of the governor has been certified under his seal of office, and the seal and signature proved.

The second point relied upon by the agents of the United States, to avoid the confirmation of this grant, is, the court has not jurisdiction, the claim having been finally settled by the rejection of the register and receiver.

If the title was confirmed by the treaty, which is the supreme law of the land, the United States have no power to create a tribunal "finally to reject a claim," without an appeal to this court. Such an act would directly violate the treaty, and must be considered void.

The decisions of the commissioners and register and receiver have never been considered final by congress itself. In every report made since the date of the Louisiana treaty upon claims, which the commissioners nominally had power to decide, an act of congress has been deemed necessary to consummate the title.

There is a case in point in the very act relating to the report, in which it is contended that this claim has been finally rejected.

The first section of the act of congress to *confine it*, provides, that all the cases except those subsequent to a certain period, are confirmed and approved. Here the government agents have two horns of a dilemma. If the decrees of this register and receiver, like the laws of the Medes and Persians, are irreversible, it must operate both ways. It will not do for any honest government to say it is final when in our favour, *aliter* when against us. If the proposition be maintained that a register and receiver appointed to sell lands, and who were not selected with reference to their ability to decide those delicate legal questions, have been invested with such extraordinary powers over the rights of individuals; it will follow of course that all such as were excluded by congress were improperly excluded, and the decision which bars the hope of redress against this claim will give confirmation to all those rejected. A contrary doctrine would involve the absurd consequence of the assumption by congress of judicial power, and of its exercise in reversing the decisions of a tribunal vested with autho-

rity by law to decide in the last resort, or, to use the language of the attorney-general, "finally to decide." The register and receiver never had such a power, and it was not competent to congress to confer it without a palpable violation of the treaty. The register and receiver never had power to decide this case at all, and consequently could not have rejected it. The cases which were authorized to be presented to commissioners, divided themselves into two classes, one of which the commissioners decided subject to the approval of congress, and the other they reported to the secretary of the treasury.

This was regulated by the quantity. The act of 1822 required them to *decide* claims under one thousand acres, and *report* all over that quantity. The act of 1823 increased the quantity, *in certain cases,* to three thousand five hundred acres. These specified cases were such as where the owners were in the actual possession and occupation of the land at the date of the treaty. It was intended to give a preference to actual occupants, who have always been deservedly favourites with the congress of the United States. This was a case in which the owner, Juan Percheman, was not in possession at the date of the treaty ; and consequently the register and receiver could only *report*, and not *decide* his case. The report was made, and opposite the name of the claimant with a short note was written "rejected." In this state this case was presented to congress. It is evident that it was not prepared before the register and receiver. This report was made after the act of 1828. That act disposed of all claims under a league square, and referred all over that quantity to the courts for decision.

This brings us to the question of jurisdiction in this case. It is contended that the court cannot take jurisdiction of any case under a league square. That is admitted under the act of 1828. This is a very different case. The act of 1830 did not dispose of these cases. A part were referred by the first section back to the register and receiver, requiring them to report the evidence. Some were confirmed. This one was rejected without the power to reject, because it was over one thousand, and under three thousand five hundred acres, without proof of actual possession. The first section of the act of 1830 disposes of certain Spanish claims. The second, of con-

flicting Spanish and British claims. The third, of British claims. The fourth section provides that " all the remaining claims which have been presented according to law, and not finally acted upon, shall be adjudicated and finally settled upon the conditions, restrictions, and limitations of the act of 1828." The claim of Percheman was a " remaining claim not finally acted upon;" because I have shown it could not be finally acted upon by the register and receiver. It was one of those which the law declared should be adjudicated upon the principles of the act of 1828. It will be observed by the court, that this act says nothing about the quantity of lana.

The question then arises, which must be decisive of the point of jurisdiction, do the words " adjudicated and settled upon the conditions, restrictions and limitations" of another law, confine the quantity to the amount authorized by that law? All these relate to the *quo modo* of the adjudication. The *conditions* are, that they are to file a bill, conduct their case, &c. The restrictions are, that certain evidence shall be admitted, and certain dates regarded. The *limitations*, that they shall be presented within a certain time. All these relate to the mode of conducting the cases remaining. This is too plain to require argument.

The third point relied upon by the United States is, that the land was conveyed by the grantee to F. P. Sanchez. Whether this land belongs to Percheman or Sanchez must be perfectly immaterial to the United States. If confirmed to Percheman, it operates eo instanti as a confirmation to Sanchez. The attempt to hunt up a deed conditional or absolute, is but an expedient to avoid the trial of the merits of the case, in the favourable decision of which the United States, as a just government, ought to feel as much solicitude as in the performance of the most sacred national obligation. These pleas in abatement and technical niceties, may serve to retard the country, impoverish individuals, promote litigation, and embarrass public justice, at the expense of individual rights and public faith. They never can receive the sanction or countenance of this court. If the petition had been filed in the name of Sanchez, and the astuteness of the government agents could have discovered the point, we should have been thrown out of

[United States v. Percheman.]

court, because possession is necessary to give validity to a deed, and because the *seal* is to the name of the attorney, and not to that of the grantee.    Such a deed conveys no title, and might have been excluded.    The record shows, however, that the contract was to be void unless the title was confirmed.  .The act of congress for 1823, dispenses with the deraignment of title; and this case is to be decided not only according to "the treaty," but the "proceedings under the same."    That act, being one of the proceedings under the treaty, dispenses with the production of deeds from the grantee; and sub-proprietors have a right to file their petition in the name of the original grantee.

The last point made by the attorney-general was, that the governor had no right to grant.    This question has been raised in every Spanish case.

Such a point could not have been expected, in the face of the royal order commanding him to grant to the individual in question by name.    This question was settled at the last term; and although an attempt has been made to reverse that decision by a bill in congress, the judiciary committee put the seal upon it by a unanimous rejection.    Upon the subject of the powers of Spanish governments, the court is furnished with translations from Soloozano's Politica Indiana.    This author is one of the most celebrated of the Spanish commentators. His authority was considered unquestionable by lord Ellen-borough in the court of king's bench, in the trial of The King v. Picton, governor of Trinidad, 3 State Trials.

Mr Chief Justice MARSHALL delivered the opinion of the Court.

This is an appeal from a decree pronounced by the judge of the superior court for the district of East Florida, confirming the title of the appellee to two thousand acres of land lying in that territory, which he claimed by virtue of a grant from the Spanish governor, made in December 1815.    The title laid before the district court by the petitioner, consists of a petition presented by himself to the governor of East Florida, praying for a grant of two thousand acres of land in the place called Ockliwaha, situated on the margins of St John's river; which

he prays for in pursuance of the royal order of the 29th of March 1815, granting lands to the military who were in St Augustine during the invasion in the years 1812 and 1813; to which the following grant is attached.

St Augustine of Florida, 12th of December 1815.   Whereas this officer, the party interested, by the two certificates inclosed, and which will be returned to him for the purposes which may be convenient to him, has proved the services which he rendered in the defence of this province, and in consideration also of what is provided in the royal order of the 29th of March last past, which he cites, I do grant him the two thousand acres of land which he solicits, in absolute property, in the indicated place, to which effect let a certified copy of this petition and decree be issued to him from the secretary's office, in order that it may be to him in all events an equivalent of a title in form.

ESTRADA.

In a copy of the grant, certified by Thomas de Aguilar, secretary of his majesty's government, the words " which documents will at all events serve him as a title in form," are employed instead of the words " in order that it may be to him in all events an equivalent of a title in form."

The petitioner also filed his petition to the governor for an order of survey dated the 31st of December 1815, which was granted on the same day; and a certificate of Robert M'Hardy, the surveyor, dated the 20th of August 1813, that the survey had been made.

The attorney of the United States for the district, in his answer to this petition, states, that on the 28th of November 1823 the petitioner sold and conveyed his right in and to the said tract of land to Francis P. Sanchez, as will appear by the deed of conveyance to which he refers; that the claim was presented by the said Francis P. Sanchez to the register and receiver, while acting as a board of commissioners to ascertain claims and titles to land in East Florida, and was finally acted upon and rejected by them, as appears by a copy of their report thereon.   As the tract claimed by the petitioner contains less than three thousand five hundred acres of land, and had been rejected by the register and receiver acting as a board of com-

missioners, the attorney contended that the court had no juris-
diction of the case.

At the trial the counsel for the claimant offered in evidence
a copy from the office of the keeper of public archives, of the
original grant on which the claim is founded, to the receiving
of which in evidence the attorney for the United States object-
ed, alleging that the original grant itself should be procured,
and its execution proved. This objection was overruled by the
court, and the copy from the office of the keeper of the public
archives, certified according to law, was admitted. The attor-
ney for the United States excepted to this opinion.

It appears, from the words of the grant, that the original was
not in possession of the grantee. The decree which constitutes
the title, appears to be addressed to the officer of the govern-
ment whose duty it was to keep the originals and to issue a
copy. Its language, after granting in absolute property, is,
"for the attainment of which let a certified copy of this petition
and decree be issued to him from the secretary's office, in order
that it may be to him in all events equivalent to a title in form"
This copy is, in contemplation of law, an original.

It appears too from the opinion of the judge, "that by an
express statute of the territory, copies are to be received in evi-
dence." The judge added, that "where either party shall
suggest that the original, in the office of the keeper of the pub-
lic archives, is deemed necessary to be produced in court, on
motion therefor a subpoena will be issued by order of the court
to the said keeper to appear and produce the said original for
examination."

The act of the 26th of May 1824, "enabling the claimants
of lands within the limits of the state of Missouri and territory
of Arkansas to institute proceedings to try the validity of their
claims," in its fourth section, makes it the duty of "the keeper
of any public records who may have possession of the records
and evidence of the different tribunals which have been consti-
tuted by law for the adjustment of land titles in Missouri, as
held by France, upon the application of any person or persons
whose claims to lands have been rejected by such tribunals or
either of them, or on the application of any person interested,

or by the attorney of the United States for the district of Missouri, to furnish copies of such evidence, certified under his official signature, with the seal of office thereto annexed, if there be a seal of office."

The act of the 23d of May 1828, supplementary to the several acts providing for the settlement and confirmation of private land claims in Florida, declares in its sixth section, that certain claims to lands in Florida, which have not been decided and finally settled, " shall be received and adjudicated by the judge of the superior court of the district within which the land lies, upon the petition of the claimant, according to the forms, rules, regulations, conditions, restrictions and limitations prescribed by (for) the district and claimants in the state of Missouri by act of congress approved May 26th, 1824, entitled " an act enabling the claimants," &c.

The copies directed by the act of 1824 would undoubtedly have been receivable in evidence on the trial of claims to lands in Missouri. Every reason which could operate with congress for applying this rule of evidence to the courts of Missouri, operates with equal force for applying it to the courts of Florida; and a liberal construction of the act of May 23d, 1828, admits of this application.

The fourth section of the act of May 26th, 1830, " to provide for the final settlement of land claims in Florida," adopts, almost in words, the provision which has been cited from the sixth section of the act of May 23d, 1828.

Whether these acts be or be not construed to authorize the admission of the copies offered in this cause; we think that, on general principles of law, a copy given by a public officer whose duty it is to keep the original, ought to be received in evidence.

We are all satisfied that the opinion was perfectly correct, and that the copies ought to have been admitted.

We proceed then to examine the decree which was pronounced, confirming the title of the petitioner.

The general jurisdiction of the courts not extending to suits against the United States, the power of the superior court for the district of East Florida to act upon the claim of the petitioner Percheman, in the form in which it was presented, must be specially conferred by statute. It is conferred, if at all, by

the act of the 26th of May 1830, entitled "an act to provide for the final settlement of land claims in Florida." The fourth section of that act enacts " that all the remaining claims which have been presented according to law, *and not finally acted upon,* shall be adjudicated and finally settled upon the same conditions, restrictions and limitations, in every respect, as are prescribed by the act of congress approved the 23d of May 1828. entitled " an act supplementary," &c.

The claim of the petitioner, it is admitted, " had been presented according to law;" but the attorney for the United States contended, that " it had been finally acted upon." The jurisdiction of the court depends on the correctness of the allegation. In support of it, the attorney for the United States produced an extract from the books of the register and receiver acting as commissioners to ascertain claims and titles to land in East Florida, from which it appears that this claim was presented by Francis P. Sanchez, assignee of the petitioner, on which the following entry was made. " In the memorial of the claimant to this board, he speaks of a survey made by authority in 1819. If this had been produced, it would have furnished some support for the certificate of Aguilar. As it is, we reject the claim."

Is this rejection a final action on the claim, in the sense in which those words are used in the act of the 26th of May 1830?

In pursuing this inquiry, in endeavouring to ascertain the intention of congress, it may not be improper to review the acts which have passed on the subject, in connexion with the actual situation of the persons to whom those acts relate.

Florida was a colony of Spain, the acquisition of which by the United States was extremely desirable. It was ceded by a treaty concluded between the two powers at Washington, on the 22d day of February 1819.

The second article contains the cession, and enumerates its objects. The eighth contains stipulations respecting the titles to lands in the ceded territory.

It may not be unworthy of remark, that it is very unusual, even in cases of conquest, for the conqueror to do more than to displace the sovereign and assume dominion over the country. The modern usage of nations, which has become law,

would be violated; that sense of justice and of right which is acknowledged and felt by the whole civilized world would be outraged, if private property should be generally confiscated, and, private rights annulled: The people change their allegiance ; their relation to their ancient sovereign is dissolved : but their relations to each other, and their rights of property, remain undisturbed.   If this be the modern rule even in cases of conquest, who can doubt its application to the case of an amicable cession of territory?   Had Florida changed its sovereign by an act containing no stipulation respecting the property of individuals, the right of property in all those who became subjects or citizens of the new government would have been unaffected by the change.   It would have remained the same as under the ancient sovereign.   The language of the second article conforms to this general principle.   " His catholic majesty cedes to the United States in full property and sovereignty, all the territories which belong to him situated to the eastward of the Mississippi, by the name of East and West Florida."   A cession of territory is never understood to be a cession of the property belonging to its inhabitants.   The king cedes that only which belonged to him.   Lands he had previously granted, were not his to cede.   Neither party could so understand the cession.   Neither party could consider itself as attempting a wrong to individuals, condemned by the practice of the whole civilized world.   The cession of a territory by its name from one sovereign to another, conveying the compound idea of surrendering at the same time the lands and the people who inhabit them, would be necessarily understood to pass the sovereignty only, and not to interfere with private property.   If this could be doubted, the doubt would be removed by the particular enumeration which follows.   " The adjacent islands dependent on said provinces, all public lots and squares, vacant lands, public edifices, fortifications, barracks and other buildings which are not private property, archives and documents which relate directly to the property and sovereignty of the said provinces, are included in this article."

This special enumeration could not have been made, had the first clause of the article been supposed to pass not only the objects thus enumerated, but private property also.   The grant

of buildings could not have been limited by the words " which are not private property," had private property been included in the cession of the territory.

This state of things ought to be kept in view when we construe the eighth article of the treaty, and the acts which have been passed by congress for the ascertainment and adjustment of titles acquired under the Spanish government.　That article in the English part of it is in these words.　" All the grants of land made before the 24th of January 1818 by his catholic majesty, or by his lawful authorities, in the said territories ceded by his majesty to the United States, shall be ratified and confirmed to the persons in possession of the lands, to the same extent that the same grants would be valid if the territories had remained under the dominion of his catholic majesty."

This article is apparently introduced on the part of Spain, and must be intended to stipulate expressly for that security to private property which the laws and usages of nations would, without express stipulation, have conferred.　No construction which would impair that security further than its positive words require, would seem to be admissible.　Without it, the titles of individuals would remain as valid under the new government as they were under the old; and those titles, so far at least as they were consummate, might be asserted in the courts of the United States, independently of this article.

The treaty was drawn up in the Spanish as well as in the English language.　Both are originals, and were unquestionably intended by the parties to be identical.　The Spanish has been translated, and we now understand that the article, as expressed in that language, is, that the grants " shall remain ratified and confirmed to the persons in possession of them, to the same extent, &c.,"—thus conforming exactly to the universally received doctrine of the law of nations.　If the English and the Spanish parts can, without violence, be made to agree, that construction which establishes this conformity ought to prevail.　If, as we think must be admitted, the security of private property was intended by the parties; if this security would have been complete without the article, the United States could have no motive for insisting on the interposition of government in order to give validity to titles which, according

to the usages of the civilized world, were already valid. No violence is done to the language of the treaty by a construction which conforms the English and Spanish to each other. Although the words " shall be ratified and confirmed," are properly the words of contract, stipulating for some future legislative act; they are not necessarily so. They may import that they " shall be ratified and confirmed" by force of the instrument itself. When we observe that in the counterpart of the same treaty, executed at the same time by the same parties, they are used in this sense, we think the construction proper, if not unavoidable.

In the case of Foster v. Elam, 2 Peters, 253, this court considered these words as importing contract. The Spanish part of the treaty was not then brought to our view, and we then supposed that there was no variance between them. We did not suppose that there was even a formal difference of expression in the same instrument, drawn up in the language of each party. Had this circumstance been known, we believe it would have produced the construction which we now give to the article.

This understanding of the article, must enter into our construction of the acts of congress on the subject.

The United States had acquired a territory containing near thirty millions of acres, of which about three millions had probably been granted to individuals. The demands of the treasury, and the settlement of the territory, required that the vacant lands should be brought into the market; for which purpose the operations of the land office were to be extended into Florida. The necessity of distinguishing the vacant from the appropriated lands was obvious; and this could be effected only by adopting means to search out and ascertain pre-existing titles. This seems to have been the object of the first legislation of congress.

On the 8th of May 1822, an act was passed, " for ascertaining claims and titles to land within the territory of Florida."

The first section directs the appointment of commissioners for the purpose of ascertaining the claims and titles to lands within the territory of Florida, as acquired by the treaty of the 22d of February 1819.

Vol. VII.—M

It would seem from the title of the act, and from this declaratory section, that the object for which these commissioners were appointed, was the ascertainment of these claims and titles. That they constituted a board of inquiry, not a court exercising judicial power and deciding finally on titles. By the act "for the establishment of a territorial government in Florida," previously passed at the same session, superior courts had been established in East and West Florida, whose jurisdiction extended to the trial of civil causes between individuals. These commissioners seem to have been appointed for the special purpose of procuring promptly for congress that information which was required for the immediate operations of the land office. In pursuance of this idea, the second section directs that all the proceedings of the commissioners, the claims admitted, with those rejected, and the reason of their admission and rejection, be recorded in a well bound book, and forwarded to the secretary of the treasury to be submitted to congress. To this desire for immediate information we must ascribe the short duration of the board. Their session for East Florida was to terminate on the last of June in the succeeding year; but any claims not filed previous to the 31st of May in that year to be void, and of none effect.

These provisions show the solicitude of congress to obtain, with the utmost celerity, that information which ought to be preliminary to the sale of the public lands. The provision, that claims not filed with the commissioners previous to the 30th of June 1823 should be void, can mean only that they should be held so by the commissioners, and not allowed by them. Their power should not extend to claims filed afterwards. It is impossible to suppose that congress intended to forfeit real titles not exhibited to their commissioners within so short a period.

The principal object of this act is further illustrated by the sixth section, which directed the appointment of a surveyor who should survey the country; taking care to have surveyed and marked, and laid down upon a general plan to be kept in his office, the metes and bounds of the claims admitted.

The fourth section might seem in its language to invest the commissioners with judicial powers, and to enable them to de-

cide as a court in the first instance, for or against the title in cases brought before them; and to make such decision final if approved by congress. It directs that the "said commissioners shall proceed to examine and determine on the validity of said patents," &c. If, however, the preceding part of the section to which this clause refers be considered, we shall find in it almost conclusive reason for the opinion that the examination and determination they were to make, had relation to the purpose of the act, to the purpose of quieting speedily those whose titles were free from objection, and procuring that information which was necessary for the safe operation of the land office; not for the ultimate decision, which, if adverse, should bind the proprietor. The part of the section describing the claims into the validity of which the commissioners were to examine, and on which they were to determine, enacts, that every person, &c. claiming title to lands under any patent, &c. "which were valid under the Spanish government, or by the law of nations, and which are not rejected by the treaty ceding the territory of East and West Florida to the United States, shall file, &c."

Is it possible that congress could design to submit the validity of titles, which were "valid under the Spanish government, or by the law of nations," to the determination of these commissioners?

It was necessary to ascertain these claims, and to ascertain their location, not to decide finally upon them. The powers to be exercised by the commissioners under these words, ought therefore to be limited to the object and purpose of the act.

The fifth section, in its terms, enables them only to examine into and confirm the claims before them. They were authorized to confirm those claims only which did not exceed one thousand acres.

From this review of the original act, it results, we think, that the object for which this board of commissioners was appointed, was to examine into and report to congress such claims as ought to be confirmed; and their refusal to report a claim for confirmation, whether expressed by the term "rejected," or in any other manner, is not to be considered as a final judicial

decision on. the claim, binding the title of the party; but as a rejection for the purposes of the act.

This idea is strongly supported by a consideration of the manner in which the commissioners proceeded, and by an examination of the proceedings themselves, as exhibited in the reports to congress.

The commissioners do not appear to have proceeded with open doors, deriving aid from the argument of counsel, as is the usage of a judicial tribunal, deciding finally on the rights of parties : but to have pursued their inquiries like a board of commissioners, making those preliminary inquiries which would enable the government to open its land office; whose inquiries would enable the government to ascertain the great bulk of titles which were to be confirmed, not to decide ultimately on the titles which those who had become American citizens legally possessed.

On the 3d of March 1823, congress passed a supplementary act, which also provided for the survey and disposal of the public lands in East Florida. It authorizes the appointment of a separate board of commissioners for East Florida, and empowers the commissioners to continue their sessions until the second Monday in the succeeding February, when they were to return their proceedings to the secretary of the treasury.

This act dispenses with the necessity of deducing title from the original grantee, and authorizes the commissioners to decide on the validity of all claims derived from the Spanish government *in favour* of actual settlers, where the quantity claimed does not exceed three thousand five hundred acres. The act " to extend the time for the settlement of private land claims in the territory of Florida," passed on the 28th of February 1824, enacts that no person shall be deemed an actual settler, " unless such person, or those under whom he claims title, shall have been in the cultivation or occupation of the land, at and before the period of the cession."

On the 8th of February 1827, congress passed an act extending the time for receiving private land claims in Florida, and directing them to be filed on or before the 1st day of the following November, with the register and receiver of the dis-

trict; "whose duty it shall be to report the same with their decision thereon," on or before the 1st day of January 1828, to be laid before congress at the next session.

These acts are not understood to vary the powers and duties of the tribunals authorized to settle and confirm these private land claims.

On the 23d of May 1828 an act passed supplementary to the several acts providing for the settlement and confirmation of private land claims in Florida.

This act continues the power of the register and receiver till the first Monday in the following December, when they are to make a final report; after which it shall not be lawful for any of the claimants to exhibit any further evidence in support of their claims.

The sixth section of this act transfers to the court all claims "which shall not be decided and finally settled under the foregoing provisions of this act, containing a greater quantity of land than the commissioners were authorized to decide, and above the amount confirmed by this act, and which have not been reported as antedated or forged," and declares that they "shall be received and adjudicated by the judge of the district court in which the land lies, upon the petition of the claimant, according to the forms," &c. "prescribed," &c. by act of congress approved May 26th, 1824, entitled "an act enabling the claimants to land within the limits of the state of Missouri and territory of Arkansas to institute proceedings," &c. A proviso excepts from the jurisdiction of the court any claim annulled by the treaty or decree of ratification by the king of Spain, or any claim not presented to the commissioners or register and receiver.

The thirteenth section enacts that the decrees which may be rendered by the district or supreme court "shall be conclusive between the United States and the said claimants only, and shall not affect the interests of third persons."

In all the acts passed upon this subject previous to that of May 1830, the decisions of the commissioners, or of the register and receiver acting as commissioners, have been confirmed. Whether these acts affirm those decisions by which claims are rejected, as well as those by which they are recommended for confirmation, admits of some doubt: whether a rejection,

amounts to more than a refusal to recommend for confirmation, may be a subject for serious inquiry: however this may be, we think it can admit of no doubt that the decision of the commissioners was conclusive in no case until confirmed by an act of congress. The language of these acts, and among others that of the act of 1828, would indicate that the mind of congress was directed solely to the confirmation of claims, not to their annulment. The decision of this question is not necessary to this case. The claim of the petitioner was not contained in any one of the reports which have been stated.

On the 26th of May 1830, congress passed "an act to provide for the final settlement of land claims in Florida." This act contains the action of congress on the report of the 14th of January 1830, which contains the rejection of the claim in question. The first section confirms all the claims and titles to land filed before the register and receiver of the land office under one league square, which have been decided and recommended for confirmation. The second section confirms all the conflicting Spanish claims, recommended for confirmation as valid titles.

The third confirms certain claims derived from the former British government, and which have been recommended for confirmation.

The fourth enacts "that all remaining claims which have been presented according to law, and not finally acted upon, shall be adjudicated and finally settled upon the same conditions," &c.

It is apparent that no claim was finally acted upon until it had been acted upon by congress; and it is equally apparent that the action of congress on the report containing this claim, is confined to the confirmation of those titles which were recommended for confirmation. Congress has not passed on those which were rejected. They were, of consequence, expressly submitted to the court.

The decision of the register and receiver could not be conclusive for another reason. Their power to decide did not extend to claims exceeding one thousand acres, unless the claimant was an actual settler: and it is not pretended that either the petitioner, or Francisco de Sanchez, his assignee,

was a settler, as described in the third section of the act of 1824.

The rejection of this claim, then, by the register and receiver did not withdraw it from the jurisdiction of the court, nor constitute any bar to a judgment on the case according to its merits.

An objection not noticed in the decree of the territorial court, has been urged by the attorney-general; and is entitled to serious consideration. The governor, it is said, was empowered by the royal order on which the grant professes to be founded, to allow to each person the quantity of land established by regulation in the province, agreeably to the number of persons composing each family.

The presumption arising from the grant itself of a right to make it, is not directly controverted; but the attorney insists that the documents themselves prove that the governor has exceeded his authority.

Papers translated from a foreign language, respecting the transactions of foreign officers, with whose powers and authorities we are not well acquainted, containing uncertain and incomplete references to things well understood by the parties, but not understood by the court; should be carefully examined before we pronounce that an officer, holding a high place of trust and confidence, has exceeded his authority.

The objection rests on the assumption that the grant to the petitioner is founded entirely on the allowance made in the royal order of the 29th of March 1815, at the request of the governor of East Florida; and the petition to the governor undoubtedly affords strong ground for this assumption; but we are far from thinking it conclusive. The petitioner says, "that, in virtue of the bounty in lands which, pursuant to his royal order of the 29th of March of the present year, the king grants to the military who were of this place in the time of the invasion which took place in the years 1812 and 1813, and your petitioner considering himself as being comprehended in the said sovereign resolution, as it is proved by the annexed certificates of his lordship brigadier Don Sebastian Kindelan, and by that which your lordship thought proper to provide herewith, which certificates express the merits and services

rendered by your petitioner at the time of the siege, in consequence of which said bounties were granted to those who deserved them;" "therefore he most respectfully supplicates your lordship to grant him two thousand acres of land in the place," &c. The governor granted the two thousand acres of land for which the petitioner prays.

The attorney contends that the royal order of the 29th of March 1815, empowered the governor to grant so much land only, as, according to the established rules, was allowed to each settler. This did not exceed one hundred acres to the head of a family, and a smaller portion for each member of it.

The extraordinary facts that an application for two thousand acres should be founded on an express power to grant only one hundred; that this application should be accompanied by no explanation whatever; and that the grant should be made without hesitation, as an ordinary exercise of legitimate authority, are circumstances well calculated to excite some doubt whether the real character of the transaction is understood, and to suggest the propriety of further examination.

The royal order is founded on a letter from governor Kindelan to the captain-general of Cuba, in which he recommends the militia as worthy the gifts to which the supreme governor may think them entitled; "taking the liberty of recommending the granting of some, which may be as follows: to each officer who has been in actual service in said militia, a royal commission for each grade he may obtain as provincial, and to the soldiers a certain quantity of land as established by regulation in this province, agreeably to the number of persons composing each family, and which gifts can also be exclusively made to the married officers and soldiers of the said third battalion of Cuba."

The words "and which gifts," &c. in the concluding part of the sentence, would seem to refer to that part which asks lands for the soldiers of the militia; and yet it is unusual in land bounties for military service, to bestow the same quantity on the officers as on the soldiers.

But be this as it may, the application of governor Kindelan is confined to the privates who served in the militia, and to the married officers and soldiers of the third battalion of Cuba.

[United States v. Percheman.]

The petitioner was in neither of these corps. He was an ensign of the corps of dragoons.

The royal order alluded to, is contained in a letter of the 29th of March 1815, from the minister of the Indies; who, after stating the application in favour of the militia, and the third regiment of Cuba, adds, " at the same time that his majesty approves said gifts, he desires that your excellency will inform him as to the reward which the commandant of the third battalion of Cuba, Don Juan José de Estrada, who acted as governor pro. tem. at the commencement of the rebellion, the officers of artillery, Don Ignacia Salus, Don Manuel Paulin, and of dragoons, Don Juan Percheman, are entitled to as mentioned by the governor in his official letter. By royal order I communicate the same to his excellency for your information and compliance therewith, enclosing the royal commissions of local militia, according to the note forwarded by your excellency."

The governor adds, " I forward you a copy of the same, enclosing also the documents above mentioned, that you may give their correspondent direction, with the intention, by the first opportunity of informing his majesty of what I consider just as to the remuneration before mentioned."

It appears then that the part of the royal order which is supposed to limit this power of the governor to grants of one hundred acres does not comprehend the petitioner; that he is mentioned in that order as a person entitled to the royal bounty, the extent of which is not fixed, and respecting which the governor intended to inform his majesty.

The royal order then is referred to in the petition, as showing the favourable intentions of the crown towards the petitioner; not as ascertaining limits applying to him, which the governor could not transcend.

The petition also refers to certificates granted by general Kindelan, and by the governor himself, expressing his merits and services during the siege. These could have no influence if the amount of the grant was fixed.

In his grant annexed to the petition, the governor says, " whereas this officer, the party interested by the two certificates enclosed, *has proved the services which he rendered in defence of*

*this province*, and in consideration also of what is provided in the royal order of the 29th of March last past, which he cites, I do grant him," &c.

Military service, then, is the foundation of the grant, and the royal order is referred to only as showing that the favourable attention of the king had been directed to the petitioner.

The record furnishes other reasons for the opinion that the power of the governor was not so limited in this case, as is supposed by the attorney for the United States.

The objection does not appear to have been made in the territorial court, where the subject must have been understood. It was neither raised by the attorney for the United States, nor noticed by the court.

The register and receiver, before whom the claim was laid by Sanchez, the assignee of the present petitioner, did not reject it because the governor had exceeded his power in making it, but because the survey was not exhibited. "If this" (the survey), say the register and receiver, "had been produced, it would have furnished some support for the certificate of Aguilar. As it is, we reject the claim."

It may be added that other claims under the same royal order for the same quantity of land, have been admitted by the receiver and register; and have been confirmed by congress.

We do not think the testimony proves that the governor has transcended his power.

The court does not enter into the inquiry, whether the title has been conveyed to Sanchez or remains in Percheman. That is a question in which the United States can feel no interest, and which is not to be decided in this cause. It was very truly observed by the territorial court, that this objection "is founded altogether on a suggestion of *a private adverse claim:*" but adverse claims, under the law giving jurisdiction to the court, are not to be decided or investigated. The point has not been made in this court.

The decree is affirmed.