Milligan, J.,
delivered the opinion of the Court.
The Chancellor, in this case, at Dandridge, pronounced a decree in favor of the complainant; from which one of the defendants, Mariah L. Holston, prayed an appeal to this Court. Subsequently, it was agreed that the record should be filed by both parties for error, and that the case should stand in the same condition as if both the complainant and defendants had appealed.
The facts necessary to be noticed, are as follows: On the 4th of October, 1864, the complainant, William Galbraith, brought his bill against B. F. McFarland, D. K. Livingston and wife, and Mariah L. Holston, in which it is alleged, that the defendant, McFarland, *269 was indebted to the complainant in the sum of $4,-059.72;' and in part satisfaction of this sum, he, by deed, on the 3d of November, 1863, conveyed to complainant, two tracts of land in Jefferson County, mentioned and described in the deed of conveyance, which was shortly thereafter, duly proven and registered. Livingston and wife, and Mariah L. Holston, claimed also to be the creditors of the defendant, McEarland, and by attachments at law, are seeking to subject the same lands to the satisfaction of their debts.
The complainant claims title under his deed, which appears to have been executed and registered, prior to the date of the attachment; but he insists, if the Chancellor shall be of the opinion that his deed is inoperative to pass a valid title to the land, that he, as a creditor of the defendant, McEarland, is entitled to priority of satisfaction. Mrs. Holston answers, and insists that prior to the execution of the deed by Mc-Earland to the complainant, the former was guilty of treason against the Gfovernment of the United States, and that the voluntary conveyance of his lands to the complainant, was, under the Act of Congress, approved July 17, 1862, commonly known as the “Confiscation Act,” an absolute nullity, and wholly inoperative and void; and that she, as an attaching creditor, prior in time, is .entitled to priority of satisfaction. Livingston and wife failed to answer, and judgment pro confesso, was regularly entered against them.
The Chancellor held, the deed, executed by the defendant, McFarland, to the complainant, utterly void under the Act of Congress; declared the proceedings *270 at law, by attachment, irregular, and directed a sale of the lands to satisfy complainant’s debt.
1. The controlling question presented in this record, arises on the construction of the 6th section of the Act of Congress, approved July 17th, 1862, which is as follows — viz:
“That if any person within any State or Territory of the United States, other than those named as aforesaid, after the passage of this Act, being engaged in armed rebellion against the Gfovemment of the United States, or aiding, or abetting such rebellion, shall not, within sixty days after public warning and proclamation, duly given and made by the President of the United States, cease to aid, countenance, and abet such rebellion, and return to his allegiance to the United States, all the estate and property, moneys, stocks and credits of such person, shall be liable, to seizure as aforesaid; and it shall be the duty of the President to seize and use them as aforesaid, or the proceeds thereof; and all sales, transfers, or conveyances of such property, after the expiration of the said sixty days from the date of such warning and proclamation, shall be null and void; and it shall be a sufficient bar to any suit brought by such person for the possession or the use of such property, or any of it, to allege and prove that he is one of the persons described in this section.”
The object and purpose of this Act of Congress, as declared in its caption, is, “to suppress insurrection, to punish treason and rebellion, to seize and confiscate the property of rebels, and for other purposes.”
*271 The leading idea and central thought, that runs through the whole body of this Act, is the speedy suppression of the rebellion, which was then flagrant throughout the South. To accomplish this desired end, the seizure and confiscation of the property of leading rebels, was esteemed of much value. In the 5th section of the Act, this purpose is directly de--clared. The language there employed, is: “That to insure the speedy termination of the present rebellion, it shall be the duty of the President of the United States, to cause the seizure of all the estate and property, money, stocks, credits, and effects of the persons hereinafter named in this section, and to apply and use the same, and the proceeds thereof, for the support of the army of the United States.” * *
This being the express object and purpose of the Act of Congress, it is wholly unnecessary to inquire whether it was the intention of the Government, that it should be executed during the contest under its belligerent rights, or after its termination, under the municipal rights of sovereignty. It is enough to know that the execution of this law, could not be enforced in the revolted States, until the rebellion had first been so far suppressed by the military power of the Government, as to enable the courts of justice to resume the regular exercise of their functions, within the limits of such seceded State. The enactment itself was practically inoperative in all the revolted States, so long as they were adversely occupied by the rebel power. The law was suspended by force; and when that force was displaced, and the courts of justice again re-opened, under the authority of the United *272 States, in any part of the rebellions States, the Act of Congress, both upon principle and reason, must be held, by relation, to be operative over the revolted States thus regained, from the date of its enact-inent.
But the Act itself, is, in its character, highly punitive, and, by the ordinary rules of the common law, as well as by the modern rules of well-established international law, must be construed strictly, and in conformity to the principles of common humanity and the modern usage of nations, which have become law. Says Chief Justice Marshall, in the case of the United States vs. Percheman, 7 Peters, 86, “Even in cases of conquest, for the conqueror to do more than to displace the sovereign and assume dominion over the country, the modern usage of nations, which has become law, would be violated; and that sense of justice and right, which is acknowledged and felt by the whole civilized world, would be outraged, if private property should be generally confiscated, and private right annulled.” If this be the modern rule in cases of conquest, it would seem that its application in cases of rebellion, when the Government has regained its former dominion over its revolted subjects, should not be more rigorous. In the one case, conquest of a foreign country, gives absolute and unlimited sovereign rights; but in the other — the case of rebellion — no nation can make any conquest of its own territory. It suppresses hostilities, and merely regains the possession of which it had been temporarily deprived. No new sovereignty is acquired, but all the rights which previously existed, are maintained. Why, then, *273 either in morals or reason, should the rule be more rigorous in the one case, than in the other? In both cases, dominion is gained over the country, and control of its population, by force of arms; and the same reason influences the population of a conquered country, to obey the laws of the conqueror, that impels the inhabitants of a revolted district, after hostilities are suppressed, to yield obedience to the authority of the metropolitan Government.
The Act of Congress, under consideration, in some degree, conforms' to the principles of humanity so generally recognized by international law. It kindly provides, that the President, by proclamation, shall warn the great mass of those engaged in armed rebellion, or giving aid and comfort thereto, to desist therefrom, and to return to their proper allegiance to the Government of the United States, on pain of the forfeitures and seizures, in the Act denounced against them. And if, after this solemn proclamation and warning, they still persist in their hostilities to the Government, they are justly to be proceeded against, through the machinery of the courts of justice. No condemnation or sale of property, either real or personal, can be ordered, until the property seized, shall first be found to have belonged to a person engaged in rebellion, or who has given aid and comfort thereto. This is, by the terms of the Act, a necessary prerequisite, without which the seizure and condemnation, would be illegal, and the sale void. The act, ipso facto, does not work the forfeiture of property, real or personal, subject to confiscation, or, of itself, in any *274 way prohibit those engaged in rebellion, or giving aid or comfort thereto, from continuing the title therein. The forfeiture results from the judgment of the Court, the order of condemnation and decree of sale. The United States is a necessary party in every proceeding of this character; and the proceeds of the sale of all such sequestered property, by the terms of the Act, goes to the use of the Government of the United States.
The crime through which the forfeiture is worked, is against the United States, and the atonement is made alone to the nation. No other person can take advantage of the law, or enforce its penalties, denounced against those who violate it. It follows, therefore, that the clause of the 6th section, which declares that “all sales, transfers, or conveyances of any such property, after the expiration of said sixty days from the date of such warning and proclamation, shall be null and void,” must be construed to mean as against the United States, and no other or third person. This construction is sustained by the latter clause of the same sentence, which declares, that “it shall be a sufficient bar to any suit brought by such person, for the possession or use of such property, or any of it, to allege and prove that he is one of the persons described in this section.” The obvious meaning of this provision of the Act, is, to protect purchasers at “confiscation sales,” made under a decree of the United States Courts, against any suit that the former owner of such property, may bring against them for its recovery; in other words, *275 to secure the title to the purchaser, and at the same time, to prevent fraudulent conveyances, made to defeat the right of the United States, to confiscate the property of those who have offended its law. How, otherwise, could the rebellion of the vendor, be plead as a bar to the suit, brought by him to recover property which he had voluntarily sold or conveyed? This would, indeed, be anomalous, and, certainly, not within the scope and meaning of the Act of Congress.
This construction, we think, is in harmony with the spirit and meaning of the Act itself, and certainly not in conflict with the enlightened Christian view, entertained by all modern nations, of confiscation laws.
It results, that the deed from the defendant, McFarland, to the complainant, is a valid monument of title as against all persons, except the United States, and liable only to be contested by it under a regular proceeding, to confiscate the lands conveyed for the crimes of the vendor.
2. This view of the Act of Congress, as. affecting this case, renders it unnecessary minutely to review the Chancellor’s decree, in other respects so elaborately criticised in argument. It is proper, however, to say, with reference to the attachment issued by the Justice of the Peace, A. K. Meek, that we are of opinion that there is no valid objection to it. The attachment, upon its face, is made returnable to the Circuit Court of Jefferson County; and the fact that the amount of the debt, claimed by the plaintiff in *276 the attachment, is beyond the jurisdiction of the Justice to hear and determine, can make no difference. The provisions of the Act of 1852, are carried into the Code, which declares, sec. 4121, that “Justices of the Peace are vested with power: 1st, To grant writs of attachment returnable to the Circuit Court in the same manner, and to the same extent, as the Circuit Judges.” However the policy of this provision of the Statute may be doubted, we are not, under the liberal rules of construction which have so often been recognized by this Court as applicable to the attachment laws, at liberty to restrain its meaning by construction, within the jurisdiction of Justices of the Peace, in other cases.
3. The objection that the attachment in this case was returned to the Circuit Court at Dandridge, and received and indorsed: “filed” by the Clerk of that Court some short time after the term for which he was elected, had, by its own limitation, expired, is alike untenable and invalid. No objection is made to the regularity and qualifications of the Clerk; and it is clear, as well upon principle of the common law, as .by our Statute of 1865, chapter 32, sec. 2, that he was, at least, an officer de facto, and, as such, his official acts, so far as they concern the rights of third persons and the public, are as effectual and valid as if they had been performed by an officer de jure.
This principle was fully recognized in a somewhat similar case, in a manuscript opinion, at the last Term of this Court, at Jackson; and, we think, it is well sustained, both by the general law, and the uniform course *277 of decisions in this State: 2 Kent’s Com., 295; Farmer’s and Merchant’s Bank vs. Chester; 6 Hum., 458; 9 Hum., 163; 2 Swan, 87.
4. Objection is also taken to the validity of the Chancellor’s decree, with reference to the defendants, Livingston and wife, on the ground that they were not served with process to answer.
The record, it is true, is silent as to the service of process upon these parties; but, whether they have not waived their right to insist on this defense, by their appearance in the Court below, does not very clearly appear; nor is it now material for us to inquire.
The original attachment, relied on by them, appears to have been lost or destroyed, and a copy has been substituted. The manner in which this substitution appears to have been effected is fatally defective. It is not enough to show, by affidavit, or otherwise, that the record, or other paper, designed to be supplied, is lost or mislaid, unintentionally. It must appear, in addition thereto, that, upon proper application to the Court, it was ordered by the Court, that the lost record, or paper, be supplied by the best secondary evidence the nature of the case will admit of: Code, sec. 3907, Lane et al. vs. R. & T. G. Jones, manuscript. Ho order of substitution in this case, appears, nor does the record show the fact that any such application was ever made. The Court is compelled, therefore, to treat this attempted substitution as a nullity, and the papers, thus introduced into this record, as furnishing no ground upon which any valid decree can be pronounced.
The decree of the Chancellor will be reversed, and a decree, entered here in conformity to this opinion; with *278 leave to the defendant, Mrs. Holston, to have the cause remanded, if need be, to enforce her attachment upon such property as was seized under it, and not affected by this opinion.