Mr. Justice FIELD,
dissenting.
I am compelled to dissent from the judgment'of the court -in this case, and from the reasons stated in the opinion upon which that judgment is founded. The opinion- appears to me to proceed upon the assumption that this is an action to enforce a contract which was illegal in its inception, and, therefore, without standing in a court of justice. And the *466 cases of Hanauer v. Doane, in the ,12th of Wallace, and Hanauer v. Woodruff, in the 15th of Wallace, are cited in support of the position that contracts of this character will not be upheld. Those authorities do establish the position that contracts entered into for the purpose 'of aiding the late insurrectionary government are» illegal and void, and will not be enforced by the Federal'tribunals. In the first case the action was upon two promissory notes, the consideration of which consisted in part of stores and supplies furnished the defendant, an army contractor of the Confederate government, with knowledge that they were to be used in aid of the rebellion, and in part of due-bills issued by the contractor to other parties for similar supplies, and taken up at his request; and the court held that the sale of the goods, being made with the vendor’s knowledge of the uses to which they .were to be applied, was an illegal transaction and.did not constitute a valid consideration for the note of the purchaser, and that the due-bills given by him for similar goods, being taken up by third parties with knowledge of the purpose for which they were issued, were equally invalid as a consideration for his note in their hands. In the second case the action was upon a promissory note, the only consideration of which consisted of certain bonds, is.sued by the convention of Arkansas which attempted to carry that State out of the Union, and issued for the purpose of supporting the war against the Federal government, and styled “ war bonds” •'on their face, %nd one of the questions presented for our determination was whether the consideration was .illegal- under the Constitution and laws' of the United States. And the court answered that it did not admit of a doubt that the consideration was thus illegal'and void; that “if the Constitution be, as it declares on its face it is,-the supreme law of the land, a contract or undertaking of any kind to destroy or impair its supremacy, or to aid or encourage auy attempt to that end must necessarily be unlawful and can never be treated, in a court sitting under that Constitution and exer cising authority by virtue of its provisions, as a meritorious consideration for the promise of any:one.”
*467 In both of these cases the. aid of the courts was sought to enforce unexecuted contracts which were illegal and void-in their inception, because made in aid of the rebellion, and all that they decide is that contracts of that character can never be enforced in the courts of that government against which the rebellion was raised. In those courts such contracts stand on the same footing as other illegal transactions, they will not be upheld nor -enforced. In both of those decisions I concurred, and in the second case I wrote the opinion of the court. I. still adhere, to the views expressed in both'cases.
But, with great respect for my associates, I am compelled to say that, in my. judgment, neither of those eases has any just application to the case at bar, or to any question prop- ’ erly involved in its decision. This action is not brought to enforce an unexecuted, contract, legal or illegal; there is no question of enforcing a contract in the ease. The question, and the only question, is whether 'the cotton seized by the forces of the. United States in. May, 1865,, was at the time the property of the claimant. If it was his property, then he is entitled to its proceeds, and the judgment of the Court of Claims should be reversed.; and in determining this question we ars not concerned with the consideration of his loyalty or disloyalty. . He was a citizen of Mississippi and resided within the lines of the Confederacy, and the act forbidding intercourse with the enemy does not apply to his case. He was subject to be treated, in common with-other -citizens of the Confederacy, as a public enemy during the continuance of the- war. And if he were disloyal in fact, and if by.his purchase of the cotton he gave aid and comfort to the rebellion, as this court adjudges, the impediment which such conduct previously interposed to the prosecution of his claim was removed by the proclamation of pardon and amnesty made by the President on the 25th day of December, 1868. He was included within the terms of that beneficent public act of the Chief Magistrate of the United States, as fully as if he had been specifically named therein. That pardon and amnesty did not, of course, and could not *468 change the actual- fact of previous disloyalty, if it existed, but, as was said in Carlisle v. The United Stales,* “they forever close the eyes of the court to the perception of that fact as an element in its judgment, nb rights of third parties having intervened.” In legal contemplation the executive pardon not merely releases an offender from the punishment prescribed for his offence, but it obliterates the offence itself
In the present case, therefore, the question of the loyalty or disloyalty of the claimant is withdrawn from our consideration; and as the non-intercourse act does not apply to his case, it does not concern the United States whether he acquired the-property from another public enemy or from oue of the States of the Confederacy, or from an agent of the Confederate government. He was in possession of the property at the time of the seizure, asserting ownership to it; and no one then disputed, and no one since has disputed his title. Who then owned the property if he did not? The United States did not own it. They did not acquire by its seizure any title to the property. They have never asserted any greater rights arising from capture of property on land in the hands of citizens engaged in the rebellion'than those which oue belligerent nation asserts with reference to such property captured by it belonging to the citizens or subjects of the other belligerent. All public property which is movable in- its nature, possessed by oue belligerent, and employed on land in actual-hostilities, passes by capture. But private, property on land, except such as becomes booty when taken from enemies in the field or besiegqd towns, or is levied as a military contribution upon the inhabitants of the hostile territory, is exempt from confiscation by the general law of nations.' Such is the language of Mr. Wheaton, who is recognized as authority on all questions of public law.. Aud “this-exemption,” he adds, “extends even to the ease of an absolute and unqualified conquest of the enemies’ country.”†
In Brown v. The United States,‡ the question arose whether *469 enemy’s property found on land at the commencement of hostilities with Great Britain, in 1812, could be seized and condemned as a necessary consequence of the declaration of war; and the. court held that it could not be thus condemned-without an act of Congress authorizing its confiscation'. The court,-speaking through Chief Justice Marshall, said that it was conceded that war-gives to the sovereign full right to take the persons and confiscate the property of the enemy wherever found, and observed that the mitigations of this rigid rule, which the humane and wise policy of modern times has introduced into practice, might more or less affect the exercise of this right, but could not impair the right itself. “That,” said the couit, “remains undiniinisbed, and when the sovereign authority shall choose to-bring it into operation, the judicial depai-tment must give effect to its will.” “But” added the court, “until that will shall be expressed, no power of condemnation can exist in the court.”
It may be doubted whether the right to confiscate- property of the enemy wherever found, which is here'stated to havé been conceded, would at this day be admitted without some qualification excepting private property on land not' engaged in actual hostilities or taken as-booty, or levied as a military contribution, as stated by Mr. Wheaton. Be that as it may, the decision is emphatic that until Congress by some legislative act directs the confiscation of private property on land, none can be ordered by the courts.*
Now, Congress has only provided for the confiscation of private property of persons engaged in the rebellion,-by the act of August 6th, 1861,† and that of July l-7th, 1862.‡ Both’of these acts require legal proceedings resulting in a judicial decree of condemnation before the title of the owner can be divested. The present ease is not brought under either of these acts. No proceedings for the condemnation *470 and forfeiture of the cotton seized, or of its proceeds, have ever been instituted by the government. The title of the claimant remains, therefore, at this day, as perfect as it did on the day the cotton was seized.
In the case of The United States v. Klein,* this court had occasion to consider the rights of property, as affected by the war, in the hands of citizens engaged in hostilities against the United States, and it held, after mature consideration, that the effect of the act of Congress of March 12th, 1868, to provide for the collection of captured and abandoned property in insurrectionary districts, under which the present action is brought, is not to confiscate, or in any case absolutely divest, the property of- the original owner, even though disloyal, and that by the seizure the government' constituted itself a trustee for those who were by that act declared, entitled, or might thereafter be recognized as entitled to the proceeds.
But it is contended that the Confederate government, being unlawful in its origin and continuance, was incapable of acquiring, holding, or transferring a valid title to the property. The court below so held in terms, and this court so far sustains that ruling as to declare that the claimant could not acquire any title to the cotton seized by purchase from that government.
Assuming that the Confederate government was thus incapable of acquiring or transferring title to property, the result claimed by the attorney-general, and held by the majority of this court, would not, in my judgment, follow. That organization, whatever its character, acted through agents. Those agents purchased and sold property. The title of the vendors passed to somebody; if it did not vest in the Confederate government, because that organization was incapable of taking the property, it remained with the ageuts. The sale of the vendors was a release and quit-claim of their interest, and when that took place the property was not derelict and abandoned. Whatever title existed to the *471 property was, therefore, in the agents if their assumed principar had no existence, and by their sale passed to purchasers from them. Undoubtedly larceny could he alleged against one who feloniously took the property from such purchaser. The taker would not be allowed in any court which administers justice to escape punishment by showing that no title passed to the purchaser.because his vendor was the agent, or assumed to be the agent, of a government which had no legal existence. And it is equally clear that the purchaser' could have maintained an action for injuries to the property thus purchased, or for its recovery if forcibly removed from his possession by a third party. The plea that the property was not his-because obtained from the agent, or a person-assuming to be the agent, of an unlawful political organization, would not be held a justification for the injuries-or the detention. "
But I do not desire to place my objection to the decision of the court upon this view of the case. I place it on higher ground, one-which is recognized by all writers, on international law,, from Grotius, its father, to Wheaton-and Phillimore, its latest- expounders, and that is, that a government de facto has, during its continuance,, the. same right within-its territorial limits to acquire and to dis'pose of movable personal property which a government de jure possesses. And that the Confederate government, whatever its character in other respects, possessed supreme .power over a large-extent of territory, embracing several States and a population of many millions, and exercised that power for. nearly four years, we are all compelled to adipit. As stated by tiffis court, speaking through Mr. Justice Nelson,* it cannot be denied that,,by the use of unlawful and unconstitutional-means, “a government in fact was erected greater in territory than many of the old governments in Europe, complete in the organization of all its parts, containing within, its limits more than eleven millions of people, and of sufficient resources in men and money to carry on a civil war of un *472 exampled dimensions; and during all which time the exercise of many belligerent rights were either conceded to it, or were acquiesced in by the supreme government, such as .the treatment of captives both on land and sea as prisoners of war; the exchange of prisoners; their vessels captured recognized as prizes of-war and dealt with accordingly; théir property seized on laud referred to the judicial tribunals for adjudication ; their ports blockaded, aud the blockade maintained by a suitable force, and duly notified to neutral powers, the same as in open and public war.”
In Thoriwgton v. Smith,* this court placed the Confederate government among that class of- governments de facto of which the temporary governments at Castine and Tampico were examples, and said, speaking through Chief Justice Chase, that “to the extent of actual supremacy, however unlawfully gained, in all matters of government within its military lines the power of the insurgent government cannot be questioned. That supremacy did not justify acts of hostility to the United States. How far it should excuse them must be left to the lawful government upon the re-establishment of its authority. But it made obedience to its authority in civil and local matters not only a necessity, but a duty. Without such obedience civil order-was impossible.”
With these authorities before me I should unhesitatingly have said — but for the fact that a majority of' my associates differ from me, aud the presumption is that they are right and I am wrong, — that it was impossible for any court to come to the conclusion that a government thus organized, having such immense resources and exercising actual supremacy over such vast territory and millions of people, did not possess tne power to acquire aud to transfer the title to personal property within its territorial limits.
Our government in its efforts to reach the property of the extinct Confederacy has asserted a very different doctrine from that announced in the court below, aud, so far as the cotton seized in this ease is concerned, approved here. It *473 has alleged .in the courts of England that that Confederacy did acquire property t.o a vast amount and attempted to reach it in the hands of its agents. In United States v. McRae* it filed a bill in the eourt of chancery -in England to obtain an account of all moneys and goods which came to the hands •of the defendant, as agent or otherwise, on behalf'of the Confederate government during the insurrection, and the payment of the moneys which, on taking such account, might be in his hands, and a delivery over of the goods in hi.s possession. The bill alleged that the Confederate government possessed itself of 'divers moneys, goods, and treas-' ure, part of. the public property of the United States, and that other moneys and goods were from time to time paid and contributed to it by divers persons, inhabitants of the United States, or were seized and acquired by that government in the exercise of its usurped authority; that it had sent to agents'-and other persons in England large amounts pf money to be laid out in purchasing goods for its use, and had sent there large quantities of goods to be sold; that it had thus scut large suras of money and large quantities of goods to the defendant, and that on the dissolution of that government he had them in his possession. And the bill claimed that all the joint or public property of the persons constituting the Confederate government, including the said moneys and goods, had vested in the United States and constituted their absolute property, and ought to be paid and delivered-to them. The eourt.held that the moneys, goods, and treasure which were at the outbreak of the rebellion the public property of the United States, and which were seized by the rebels, still continued the moneys, goods, and treasure of the United'States, their rights.of property and rights of possession being in no wise divested or defeated by the wrongful seizure. But that with respect to property which had been voluntarily contributed to or acquired bj’ the insurrectionary government, and impressed in its hands with the character of public property, the right of the United *474 States was that of a successor of the Confederate government; and that they could recover such property from an agent of that government, but subject^ however, to the same rights and obligations, to which that government would have been subjected, had it not been overthrown.
In the cáse of The United States v. Prioleau,* the same court again held that the-government of the United States could recover the property of the Confederate government, as'its successor or representative in the hands of its agents, but that they must take it subject, to all the liens and conditions arising from the contract upon which the property was received by the agents. Neither the United States, in the prosecution of these suits, nor the courts of England in deciding them, expressed the slightest doubt that the title to the property, not originally owned by the United States, had been acquired by the Confederate government, which was in the hands of its agents. And I submit that a response by those courts to the claim of the United States, that the insurgent government, being illegal in its-.origin and continuance,'could neither take, hold, nor transfer title to personal property, would not have been acquiesced in,- nor deemed respectful by ou£ government. And I submit respectfully that -the earnest denunciation of the wickedness of the rebellion, contained in the opinion of the majority, is no legal answer to the demand of the claimant for the proceeds of his property seized and sold by our,government, when that government long since pardoned- the only offence of which that claimant Was guilty, and thus gave him the assurance that he should stand in the courts of his country in as good plight and condition as any citizen, who had never siuned against its authority.
I’ am, therefore, of opinion that the judgment of the Court of Claims should be reversed.

 16 Wallace, 151.

 Law of Nations, Lawrence’s edition, 596.

 8 Cranch, 152.

 See also instructions of Mr. Adams, when Secretary of State, to our Minister at St. Petersburg, July 5th, 1820, and Halleck, 457; Hefter, § 133; and United States v. Pereheman, 7 Peters, 51.

 12 Stat. at Large, 319.

 Ib. 589.

 13 Wallace, 136.

 Mauran v. Insurance Company, 6 Wallace, 14.

 8 Wallace, 10.

 8 Law Reports, Equity, 69.

 2 Hemming & Miller’s Chancery Cases, 559.