Browning *v.* Estate of Browning, Deceased.

Filed February 18, 1886.

1. LIMITATIONS—PROMISSORY NOTES—MEXICAN LAW.

The provision of the act of congress organizing the territory of New Mexico, § 10, that "the supreme and district courts respectively shall possess chancery as well as common-law jurisdiction," applies to procedure only, and did not substitute for the Mexican and Spanish jurisprudence the rules of the common law regulating property. The limitation of actions on notes, as fixed by the Mexican laws at 10 years, remained unchanged.

2. SAME—COMMON LAW—ACT 21 JAC. I.

By act of January 7, 1876, (Comp. Laws N. M. 1884, § 1823,) providing that "in all courts of this territory the common law, as recognized in the United States of America, shall be the rule of practice and decision," the common law was substituted for the Mexican and Spanish system, and the statute of limitations, (21 Jac. I.,) by which actions on promissory notes are limited to six years, went into effect.

3. SAME—EXTENSION OF PERIOD.

The act of January 23, 1880, (Comp. Laws N. M. 1884, § 1870,) provided that suits on all causes of action then existing might be commenced within two years from the passage of that act. By act of January 21, 1882, (Comp. Laws N. M. 1884, § 1871,) this period was extended for two years longer. *Held*, that action on a promissory note, due Nov. 2, 1872. and presented for payment to the administrator of the maker in July, 1883, was not barred.

4. CLAIMS AGAINST DECEDENT'S ESTATE.

Where the law prescribes no form of presentment of a claim against the estate of a decedent, the fact that it was sent to the probate clerk and by him presented to the administrator for settlement is a sufficient presentment, if done within one year after decedent's death, as required by section 2225, Id.

Appeal from district court, San Miguel county.

*T. B. Catron* and *John D. W. Veeder*, for appellant.

*O'Bryan & Pierce*, for appellee.

BRINKER, J. On November 1, 1872, C. R. Browning executed and delivered to M. E. Browning his promissory note for $1,000, due one day after date, with interest from date at the rate of 10 per cent. per annum, payable annually, and, if not so paid, to become a part of the principal, and bear the same rate of interest. On November 14, 1882, C. R. Browning died. This proceeding was commenced in the probate court of San Miguel county, where the note was allowed against the estate of decedent on July 10, 1884, from which Emma T. Browning, administratrix, appealed to the district court. The record shows that in 1883 one C. A. Rathbun acted as administrator, and that afterwards, and in 1884, Emma T. Browning acted as administratrix of the estate; but it nowhere shows the date of the letters of administration of either, and if those of Rathbun were revoked, such revocation does not appear.

In the district court, the note, with an indorsement of the payment of $100 on April 26, 1882, was introduced in evidence by plaintiff, over defendant's objection. To the note was attached an affidavit of plaintiff showing that he was the owner of the note, and the amount due upon it after allowing all just credits. This affidavit was offered in evidence by plaintiff, but rejected by the court. To this action of the court plaintiff saved an exception. Plaintiff then produced as a witness Jesus Maria Tafoya, who was duly sworn, and testified as follows:

"I am and have been for years clerk of the probate court of San Miguel county. [Here envelope, claim, and affidavit shown witness.] I know these. I received them, I think, by mail, through the post-office in Las Vegas, from the plaintiff's attorneys. They were not sent to me in my official capacity, but in my private capacity. Accompanying them was a letter from her attorneys, which I have now lost, and cannot find, which said that they had heard of me, and wanted me to put the claim in the hands of some good lawyer for collection against the estate. I think they came to me in my private capacity, and not officially, and that they came to me through the post-office. It came in this envelope. The claim was never marked filed. It was presented by John D. W. Veeder for approval in July, 1884."

On the following day, said witness came voluntarily into court, and, after stating that he had more fully considered the matter and examined his correspondence, asked to correct his testimony as before given. He then testified as follows:

"I received this claim, and the affidavit attached to it, in this envelope, on or about the eighteenth day of May, 1883. I know this from correspondence from the attorneys, who sent it of that date, referring to this claim, and asking what had been done with it. The claim came by Wells, Fargo & Co.'s express. As I recollect, Jack Churchill, who was then my deputy-clerk, receipted for it to the express company, and handed it to me. I tore off the outside envelope, which I think was directed the same as this. I then, without opening it, placed it in my safe, in the office of the probate clerk and county judge, where it remained until the next regular term of the probate court, when I took it out, and gave it to the judge of probate court, while court was in session. The judge opened it, and found this claim and affidavit, and directed me to present it to C. A. Rathbun, then administrator of the estate of C. R. Browning, deceased, for approval. A few days afterward Rathbun came into the probate clerk's office, and I presented this claim and affidavit to him. Rathbun told me he would look at his books, and see if the claim was correct. I heard nothing more of it until July, 1884, when J. D. W. Veeder, as attorney for Mrs. M. E. Browning, made application to the probate judge to have the administratrix summoned to show cause why the claim should not be approved. The letter directing me to place the claim in the hands of some good attorney was received some time after the claim. The attorneys who sent the claim to me were dissatisfied by the delay, and then instructed me to place it in the hands of an attorney. I made no file-marks on any of these papers, nor is there any entry upon the records of my office showing when I received them. It is not customary in this office to put file-marks upon claims left there for presentation to the court, nor is it customary to make any record of them until some action is taken by the court."

Plaintiff then offered a letter from C. A. Rathbun dated June 2, 1883, addressed to plaintiff's counsel in Pueblo, Colorado, in which he states, in substance, that he had received a letter from said counsel concerning plaintiff's claim against the estate; that decedent had, in his will, directed its payment; that he would approve the claim at the July term of court; that there was no necessity for incurring expense, as he would take pleasure in paying it as soon as he could in justice to the estate. This letter was rejected by the court, and plaintiff again excepted. The cause was submitted to the court without the intervention of a jury, and judgment was rendered for the estate. From this judgment M. E. Browning appealed to this court.

To sustain the action of the court below, defendant contends that the note was barred by the general statute of limitations, but, if not, then it was barred by the special statute of limitations, because, as she claims, it was not presented-to the administrator for settlement within one year from the death of the maker. In support of the first proposition, counsel insist that the organic act of 1850 introduced here the common law of England, and that the statute of 21 Jac. I., limiting actions upon promissory notes to six years, thereby became the statute of limitations of this territory. Section 10 of the organic act is as follows: "The supreme court and the district courts, respectively, shall possess chancery as well as common-law jurisdiction."

Did this section of the organic act bring into this territory the common law, in its broadest sense, or did it simply establish a system of procedure according to the course of the common law ? In other words, did it bring into full operation the body of the common law, which creates, defines, limits, and extends the rights of persons and property? or did it merely give us a method by which rights already, existing, defined, and limited by some other law should be enforced in courts created by that act.?

Strange as it may appear, this question has never been decided by this court, although the judges have at various times let fall expressions which to the superficial reader would seem to indicate an opinion on the part of the court that the common law in its widest scope was in force here by virtue of the provisions of section 10, *supra;* but a careful examination of the decisions will show that the judges did not intend to be so understood.

*Leitensdorfer* v. *Webb,* 1 N. M. 34, was a case in which the rights adjudicated arose prior to the passage of the organic act, but the suit was commenced afterwards. In that case the court say :

"By the tenth section of the organic law it is provided that the supreme and district courts, respectively, shall possess chancery as well as common-law jurisdiction. Jurisdiction is properly the power to hear and determine causes. The common law, then, at least so far as to control and regulate the proceedings of the district court in the hearing and determining of causes, has been extended over this territory by act of congress, and that court, when it proceeds to hear and determine, must observe the course of proceeding prescribed by the common law, although the rights and liabilities of parties are to be determined according to the Mexican laws in force, and the acts of congress, and of the legislative assembly, applicable to the subject."

In *Pueblo of Laguna* v. *Pueblo of Acoma,* 1 N. M. 220, it was contended that the action was barred by the statute of limitations. The court say : "If defendant intends to insist upon the statute of limitations, he should plead it." But whether the court had in mind the statute of James I. or the Mexican law of prescription is left to conjecture. In *Arellano* v. *Chacon,* 1 N. M. 269, it was held that the district courts might try issues by juries, set aside verdicts, and grant new trials; that these high powers were expressly conferred as a

part of the common-law jurisdiction established by the organic act. In *Territory* v. *Maxwell*, 2 N. M. 250, the court, in deciding a criminal case founded upon a territorial statute, declined to follow the rule laid down in England concerning the description of property in an indictment for embezzlement.

Thus it will be seen that this court, at the most, has only recognized the common-law procedure regulating issues, jury trials, setting aside verdicts, and granting new trials. We apprehend that in suits at law, involving more than $20, a jury could have been demanded, from the time of the Conquest, without regard to the organic act. The seventh amendment to the constitution expressly declares that in such cases the trial by jury shall be preserved. This provision is self-enforcing, and established the right to jury trials, independent of any action by congress or the legislature. So the fact that such trials have been had, adds no weight to the argument. Precisely what is meant by the term "common law," as used in the section under consideration, seems never to have been accurately and clearly defined.

In *Parsons* v. *Bedford*, 3 Pet. 433, Judge STORY, in discussing the seventh amendment to the constitution, says:

"The phrase 'common law,' found in this clause, is used in contradistinction to 'equity' and 'admiralty' and 'maritime jurisprudence.' * * * When, therefore, we find that the amendment requires that the right of trial by jury shall be preserved in suits at common law, the natural conclusion is that this distinction was present to the minds of the framers of the amendment. By common law they meant what the constitution denominates, in the third article, 'law;' not merely suits which the common law recognized among its old and settled proceedings, but suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized. Probably there were few, if any, states in the Union in which some new legal remedies, differing from the old common-law forms, were not in use; but in which, however, the trial by jury intervened, and the general regulations in other respects were according to the course of the common law. Proceedings in cases of partition and of foreign and domestic attachments might be cited as examples, variously adapted and modified. In a just sense, the amendment, then, may well be construed to embrace all suits which are not of equity and admiralty jurisdiction, whatever may be the peculiar form which they assume, to settle legal rights."

The organic act is the constitution of this territory, (*Ferris* v. *Higley*, 20 Wall. 375,) and the legislature cannot make laws in conflict with it, nor in conflict with laws adopted by it. Now, if section 10 of that act imported the common law in all its parts, all acts of the legislature in conflict with the common law—such as allowing persons to testify, in civil causes, when their rights were to be determined therein; allowing defendants to be witnesses in their own behalf, in criminal cases; and various other statutory provisions which were unknown to and in the very face of the common law—would be invalid. But we know that such statutes have been passed here, and in other territories, having precisely similar provisions in

their organic acts, and they have never been questioned. On the contrary, they have been accepted and obeyed by the people, and uniformly enforced by the courts; and, indeed, their validity has been expressly recognized by the supreme court of the United States.

In *Parish* v. *Ellis,* 16 Pet. 451, (appealed from the territory of Florida,) TANEY, C. J., says:

"* * * In many of the states and territories, the ancient common-law remedy for the purpose of obtaining an allotment of dower, as well as the remedies for other mere legal rights, has been changed for others more convenient and suitable to our habits. Yet they are regarded as cases at law, although they are not carried on according to the forms of the common law."

In the leading case of *Hornbuckle* v. *Toombs,* 18 Wall. 648, BRADLEY, J., discussing the ninth section of the organic act of Montana, which is in the same language as section 10 of the organic act of this territory, said:

"Whenever congress has proceeded to organize a government for any of the territories, it has merely instituted a general system of courts therefor, and has committed to the territorial assembly full power, subject to a few specified or implied conditions, of supplying all details of legislation necessary to put the system into operation, even to the defining of the jurisdiction of the courts. As a general thing, subject to the general scheme of local government chalked out by the organic act, and such special provisions as are contained therein, the local legislature has been invested with the enactment of the entire system of municipal law, subject also to the right of congress to revise, alter, and revoke at its discretion. * * * From a review of the entire past legislation of congress on the subject under consideration, our conclusion is, that the practice, pleadings, and forms and modes of proceeding of the territorial courts, as well as their respective jurisdictions, subject, as aforesaid, to a few express or implied conditions in the organic act itself, were intended to be left to the legislative assemblies, and to the regulations which might be adopted by the courts themselves."

The court in this case overruled several former decisions, and held the "practice act" of Montana, which provided that there should be but one form of civil action, to be within the power of the legislature to enact, and consequently valid.

From what has been said, it would seem clear, both upon principle and authority, that congress did not intend, by the use of the words "common law" in the organic act, to speak into existence here the common law of England in all its fullness. This view is strengthened by the reflection that, when this territory was acquired, it was inhabited by an enlightened, civilized people, possessed of a full and complete system of municipal laws, creating, defining, limiting, and extending their rights of persons and of property. It cannot be reasonably held that the purpose of congress was to strike down and destroy this system of laws, under whose influence these people had always lived, and impose upon them, by these equivocal words, laws in a language foreign to them, and of which they had no knowledge,— laws whose terms, conditions, penalties, extent, and limitation bore

little, if any, resemblance to those by which they had always been governed. *U. S.* v. *Perchcman*, 7 Pet. 51.

The just interpretation of the section under review is that it created courts of general jurisdiction in which all rights of persons and things, whether arising under the civil law as it obtained in Mexico prior to the treaty of cession, or under the common law, the acts of congress, or the statutes of the territory, should be protected and enforced. *Ferris* v. *Higley, supra; Territory* v. *Flowers*, 2 Mont. 531; Kearney, Code, C. L. 1865, p. 512.

The limitation of actions on promissory notes, at the time the note in question was executed, was fixed by the Mexican laws at 10 years after the cause of action accrued. Schmidt's Laws of Spain and Mexico, 293, art. 1386, Leyes de Toro, 63d. Thus the law of limitation stood until January 7, 1876, when the legislature enacted that "in all courts of this territory, the common law, as recognized in the United States of America, shall be the rule of practice and decision." Section 1823, C. L. 1884.

To properly determine what is meant by this section, and what parts of the common law, or whether the whole, the legislature intended to establish as the rule of practice and decision, is exceedingly difficult. This difficulty arises mainly from the use of the words "as recognized in the United States of America." There can be no common law of the United States as a unit. The general government is composed of a number of independent sovereign states, each of which has its local customs, usages, and common law. *Wheaton* v. *Peters*, 8 Pet. 658. What is common law in one state is not necessarily so in another. Id. In the various states, the common law "as recognized," is by no means uniform. This want of uniformity springs from the fact that in many of them the legislatures have adopted the common law and certain English statutes passed by parliament prior to a particular date fixed in the act of adoption. In most of those states which were a part of the original 13 colonies, and which have not adopted the common law and the British statutes by legislative enactment, the courts have defined the common law to be the *lex non scripta* and such statutes of Great Britain of a general nature, in amendment of the common law, not locally inapplicable, nor in conflict with the constitution of the United States, the acts of congress, or the constitution and laws of the particular states, and which are suitable to the condition of their inhabitants, in force at the time of the emigration of our ancestors. *Patterson* v. *Winn*, 5 Pet. 233; *Wheaton* v. *Peters*, 8 Pet. 658; Cooley, Const. Lim. § 23, *et seq.*

Judge COOLEY says, (Const. Lim. § 25:)

"The colonies had legislatures of their own, by which laws had been passed which were in force at the time of the separation, and which remained unaffected thereby. When, therefore, they emerged from the colonial condition into that of independence, the laws which governed them consisted—*First,*

of the common law of England, so far as they had tacitly adopted it as suited to their condition; *second*, of the statutes of England or of Great Britain amendatory of the common law, which they had in like manner adopted; and, *third*, of the colonial statutes. The first and second constituted the American common law."

Again the same author says:

"The acts of parliament passed after the settlement of a colony were not in force therein unless made so by express words or by adoption. Those amendatory of the common law, if suited to the condition of things in America, were generally adopted by tacit consent." Id. § 24, note 2.

From this it seems that the common law, and such British statutes as were suited to their condition, became the heritage of our early ancestors until they had formed governments of their own, called "colonial;" but afterwards such statutes as were passed by parliament did not become law in the colonies, unless so expressed in the statute, or unless they were adopted expressly or tacitly. The reason for this appears to be that they had legislatures competent to pass laws for their own government. But is this true as to territory acquired subsequently, and which formed no part of the original colonies?

"The evidence of the common law consisted in part of the declaratory statutes we have mentioned, * * * but mainly in the decisions of the courts. * * * While colonization continued, that is to say, until the war of the Revolution actually commenced, these decisions were authority in the colonies, and the changes made in the common law up to the same period were operative in America also, if suited to the condition of things here. The opening of the war of the Revolution is the point of time at which the continuous stream of the common law became divided." Cooley, Const. Lim. § 25.

Another eminent authority, in tracing the sources of the common law in this country, says:

" * * * So we shall find that at the Revolution of 1776, by the constitutions of most, if not all, the states, the great body of the common law, and such of the English statutes as were not repugnant to our system, were preserved and adopted as binding upon us. But the common law of England is perpetually fluctuating; and it would have been altogether inconsistent with proper notions of national independence to give to the law of a foreign country any permanent control over our tribunals or our people. It was therefore necessary to fix a time after which any changes in the law of the mother country would have no effect here. And that period is the Revolution. That epoch is the era of our independence, legal as well as political, and we recognize no foreign law posterior to that period binding upon us as authority." Sedg. St. & Const. Law, 10. "The great body of the common law of England, and of the statutes of that country as they existed in 1776, are then, so far as applicable to our condition, the basis of our jurisprudence." Id. 14.

From the authorities cited it is clear that there are three classes of "common law as recognized in the United States of America:" *First*, in those states which were a part of the original colonies, and which have not by legislation adopted statutes passed prior to a par-

ticular date, the unwritten law, and such general British statutes, applicable to their condition, as were in force at the time of the formation of the colonial governments, and such as were afterwards adopted, expressly or tacitly, constituted the common law; *second*, in those states which have adopted the common law, and the British statutes passed and in force prior to the date fixed in the act of adoption, and were of a general nature, and suitable to their situation, such common law and statutes constitute their common law; and, *third*, in those states and territories which were not of the original colonies, and which have not in terms adopted any English statutes, but have adopted the common law, the unwritten or common law of England, and the acts of parliament of a general nature, not local to Great Britain, which had been passed and were in force at the date of the war of the Revolution, and not in conflict with the constitution or laws of the United States, nor of the state or territory, and which were suitable to the wants and condition of the people, are the common law of such states and territories.

This territory belongs to the last class. It was not a part of the original colonies, but was acquired in 1848. The legislature has not in terms adopted any British statutes, nor has it undertaken to define what is embraced in the words "common law" used in section 1823, *supra*. We are therefore of opinion that the legislature intended, by the language used in that section, to adopt the common law, or *lex non scripta*, and such British statutes of a general nature, not local to that kingdom, nor in conflict with the constitution or laws of the United States, nor of this territory, which are applicable to our condition and circumstances, and which were in force at the time of our separation from the mother country.

The statute of limitations (21 Jac. I.) falls within this category, and became the law of limitations here in 1876, abrogating the Mexican law of prescription. By this statute (21 Jac. I.) actions on promissory notes were limited to six years, and the statute continued in force until January 23, 1880, when the legislature passed an act (section 1870, C. L. 1884) by which it was provided that suits upon all causes of action then existing might be commenced within two years from the passage of that act. On January 21, 1882, just two days before the time limited in the act of 1880 had expired, section 1870, *supra*, was amended so as to extend the time for commencing actions upon existing causes for two years longer. Section 1871, C. L. 1884. This proceeding was commenced in the probate court, before the expiration of the time limited in section 1871, and could not have been barred by the general statute of limitations. *Sohn* v. *Waterson*, 17 Wall. 596.

It has been pressed upon us with much earnestness that these statutes only apply to suits commenced in the district court by bill or declaration, and have no application to proceedings in the probate courts. In this counsel are in error. Section 1870 says: "Any

person having or being entitled to a cause of action * * * may commence suit therefor," etc.; and section 1871 says: "Any person who has or was entitled to a cause of action * * * may commence suit therefor," etc. There is nothing in either of these sections so restrictive as to sustain counsel's contention. These statutes, in the absence of words showing a contrary intent, will apply to proceedings in any court of the territory, unless there is some other provision in conflict with them. We have been unable to find such other provision.

The evidence shows that this claim was sent to the probate clerk in May, 1883, and by him presented to the administrator for settlement at the next term of probate court thereafter, which was in July, 1883. The administrator said he would examine his books to see if it was correct.

The law prescribes no form of presentment, and, in the absence of an objection by the administrator as to the manner of presentment for approval or settlement, we think this was sufficient. This was done within one year after decedent's death, as required by section 2225, C. L. 1884. We see no error in the action of the court in rejecting the affidavit. We are aware of no statute making such an affidavit competent evidence, nor was there error in rejecting the letter from Rathbun. It did not purport to refer to the note, but to some claim against the estate provided for in the will. But even if it did refer to this note, the letter to which it was an answer evidently was not a presentation of the claim for settlement, but was simply an inquiry, or at most a demand.

For the errors committed by the court in holding the note barred by the general statute of limitations and the statute concerning the settlement of demands in one year from the death of the deceased, the judgment is reversed, and the cause remanded.

HENDERSON, J., and LONG, C. J., concur.