**MULU of Nu'uuli, LEVALE of Luma, LAOLAGI of Olosega, SOTOA of Tau, Plaintiffs**
Government of American Samoa (Intervener)

v.

**TALIUTAFA of Luma, Defendant**

No. 17-1953

High Court of American Samoa

Civil Jurisdiction, Trial Division

[Land: "Lalopua" in Tau]

October 22, 1953

ARTHUR A. MORROW, *Chief Judge;* LETULIGASE-NOA, *Associate Judge;* and OFOIA, *Temporary Associate Judge.*

OPINION AND DECREE

Heard at Fagatogo on August 3 to August 17, 1953 before MORROW, *Chief Judge, Associate Judge* NOA, and *Temporary Associate Judge* OFOIA. *Associate Judge* PULETU sat on the court during the first two days of the hearing and then withdrew because of illness.

Solosolo, counsel for Mulu;

Lata, counsel for Levale;

Save, counsel for Laolagi;

Atufili and Aumoeualogo, counsel for Sotoa;

G. W. Hedman, Attorney General, for the Government of American Samoa;

Taliutafa *pro se* assisted by Faamausili.

MORROW, *Chief Judge.*

Taliutafa filed his application with the Registrar of Titles to have certain land in Tau, described as Lalopua in the survey accompanying the application for registration, registered as the communal family land of the Taliutafa title. Mulu filed an objection to the proposed registration claiming that the property was his own individually owned land. Laolagi filed an objection to the proposed registration and claimed the land in the right of Matautia. Levale filed an objection to the proposed registration claiming that a part of the land called Avasii was owned by her as an individual. Sotoa filed an objection claiming that the property offered for registration was the communal land of the Sotoa family. During the course of the hearing the Government of American Samoa filed its petition of intervention claiming that if the Court should find that the land which was the subject of the litigation was crown land then it was the property of the Government of American Samoa.

■ It was stated by Chief Justice Wythe in the case of *Levale et al. v. Toaga* (No. 26A-1945, High Court of American Samoa) that "The question of title to real estate in American Samoa is always a difficult one to solve for the reason that in most cases there is no recorded title to, nor description of the property. Title to real estate is generally proved by family tradition." There is no recorded title to the property involved in this case. Consequently the Court must rely mostly upon family tradition to ascertain ownership and that has been the practice in similar cases here for many years. In this case the tradition goes back hundreds of years. Each of the parties, with the exception

of the intervenor and Levale, tried to establish ownership through the tradition of his own family with respect to the land. Consequently, the Court heard four different traditions, no two of which were the same.

Taliutafa claimed that the land described in the survey as Lalopua was one piece composed of three smaller pieces, viz., Avasii, Lalovi and Lalopua. The other claimants claimed that these three smaller pieces were entirely separate, having no connection with each other.

In the case of *Levale et al. v. Toaga,* supra, the Court decided that the land known as Avasii was the property of Levale. In view of the evidence in this case, we think that the decision was correct. While Sotoa claimed in this case that Avasii was the communal family land of the Sotoa title, nevertheless, the record of the testimony in the 1945 case shows that he himself testified that his people had given that very piece of land to Levale. Levale is, we believe, a member of the Sotoa family, and that the family should give her the land Avasii is quite understandable. It appears from the evidence in this case that Levale's parents had used the land Avasii for many years, that some of her ancestors are buried on it and that she herself has used it for a number of years. In view of the Court's decision in the 1945 case and of the evidence before us, we believe and we hold that Avasii is the individually owned land of Levale. We can see no reason for disturbing the decision in the 1945 case.

While there is considerable difference in the various family traditions introduced in evidence with respect to Lalopua, all of them have a number of elements of agreement. It is an historical fact that Manua, composed of the islands of Tau, Olosega and Ofu, constituted an independent kingdom for several hundred years preceding the cession of the islands by the king and his chiefs to the United States in July 1904. The tradition in the Sotoa family is to

the effect that there were about thirty-five Tuimanuas and that their pule covered the period from about 839 A.D. to the time of the cession in 1904. The Sotoa tradition was also to the effect that during this time the land Lalopua was occupied and used by these kings. It had on it a house called the Faleula. The king and his councilors met in the Faleula for the transaction of the king's business as a sovereign. Tuimanua Tauveve, Tuimanua Elisara, Tuimanua Alalamua and Queen Margaret, who was also a Tuimanua have their graves on Lalopua. These graves are well marked. There was evidence that other Tiumanuas are buried on Lalopua in unmarked graves. We believe from the evidence that the Tuimanuas resided on Lalopua although there was some evidence that some of the thirty-five did not actually occupy the land for residential purposes. The Tuimanua was not a matai, he was a king. Tuimanua was. a king's title, not a matai title. Sotoa in his written statement to the Court, duly filed, stated that Lalopua was known as "the crown estate." He testified that "Whenever he (Sotoa) is granted the crown he came and reside in Lalopua which is the land called the land of the crowns." In response to the question "Then it is correct to say that Tuimanuas were crowned in Lalopua?" Sotoa answered, "Yes." He testified in the *Levale v. Toaga* case, supra, that Lalopua was Tuimanua land. Sotoa testified that the crown was kept in a small cage-like affair also called the Faleula and that this small Faleula containing the crown was kept on Lalopua. Itulagi, a member of the To'oto'o, in response to the question "Now, is Lalopua a crown land?" answered "It is a crown land." He also testified that the Tuimanuas resided in Lalopua. Fa'amausili, another member of the Tootoo, claimed that the Anoalo family was established by Tuimanua Moaatoa (one of the late Tuimanuas) and that his descendants constituted its membership. Leota, a blood brother of Sotoa, testified that

the Anoalo family was established about 840 A.D. by Sotoa Aliimanaia (claimed by Leota to be the first Tuimanua to occupy Lalopua) and his brother. It would seem if Anoalo means descendants of kings, which it undoubtedly does, that there would be as many Anoalo families as there were kings who had descendants; and presumably most of the thirty-five Tuimanuas did have descendants and therefore there would be many Anoalo families. Mulu is a descendant of Tuimanua Moaatoa. It appears to us from the weight of the evidence that Lalopua was Tuimanua land, crown land, for several hundred years before the establishment of the Anoalo family in which Taliutafa claims membership and also for several hundred years before the establishment of the Anoalo family in which Laolagi and Moetoto (who represents claimant Mulu in this case) claim ownership.

■■ Taliutafa claims that the Court in the case of *Silia v. Chris Young* (No. 5-1925, High Court of American Samoa) decided that the Anoalo family was the owner of the land Lalopua. The Court in the opinion in that case said "The Court also finds that the Anoalo family are entitled to the custody of the land Lalopua and that in the absence of Chris Young from Manua his brothers and sisters as members of that family and as lineal descendants of the Tuimanuas have the right to the custody and control over this land in the same measure and degree as they have had in the past." It is to be noticed that this is not a statement at all that the Anoalo family is the owner of Lalopua. It merely says that the Anoalo family has the same right with respect to custody and control that it had in the past without deciding what the intent of that right was. The Silia case involved the right to the matai name Taliutafa, not the ownership of the land Lalopua. Chris Young filed an application to be registered as the Taliutafa and Silia filed an objection and became a candidate for the name himself.

The only question before the Court was whether Silia or Chris Young, or neither of them, should be given the name. The Court decided that neither should be given the name. The statement about the right and custody and control of Lalopua was *obiter dictum* made by the Court as a passing remark. It was not decision as the case in no way involved the ownership of the land Lalopua but only the right to the matai name Taliutafa. Furthermore, a judgment is binding only on the parties in it and their privies. Strangers are not bound by a judgment. *Harris v. Hardeman*, 55 U.S. 334, 14 Howard 334, 14 L.Ed. 444. It is elementary law that a judgment or decree affecting property rights binds only the portion before the Court and those who stand in privity with them. *In re Howard*, 76 U.S. 175, 9 Wall. 175, 19 L.Ed. 635. Even if the statement in the opinion in the Silia case were a judgment, which it is not, such judgment would not be binding upon objectors Mulu, Levale, Laolagi, Sotoa or the Government of American Samoa, intervenor, they being neither parties in the Silia case, nor privies. Furthermore the Court's statement was based upon the testimony of Chris Young (now Taliutafa) and his sister Toaga without the objectors in the present case having had an opportunity to give testimony, they not being parties.

It is our conclusion from the evidence, and we think that the evidence was overwhelming, that Lalopua was crown land and the property of the Tuimanua in his capacity as king and sovereign. The Tuimanuas did not inherit their title. The kingship, as we have already said, was not hereditary. The Tootoo (Sotoa testified the Tootoo and the Sotoa) and the Faletolu selected the Tuimanua and he might come from any family; might be anybody. Lalopua was clearly not matai land.

The question now is, in whom did the title to Lalopua vest when the kingship came to an end in 1904 upon the

cession of the Manua Islands to the United States by Tuimanua Elisara and his chiefs? The cession of the Islands passed the sovereignty from the Tuimanua to the United States of America.

When the king of France lost his throne in 1870 and the Republic of France was established, the royal property, that is the property owned by the king as king, was vested in the Ministry of Finance of the new French Government. The decree as vesting it reads in part as follows: "The buildings of the crown, the Movable and immovable property of the crown, are vested in the Ministry of Finance." When the German Kaiser lost his throne at the end of World War I, the property which he owned in his capacity as the king of Prussia was by decree vested in the new German Government. A similar thing happened in Austria, a law of April 3, 1919 providing that "The Republic of German-Austria is the owner of all movable and immovable crown property located in her territory. . . ." And when the king of Spain lost his throne a decree provided that "All patrimonial property of the crown is transferred to the State." It should be noticed from the foregoing instances that the transfer of property to the new government was effected by an internal law proclaimed by the new government.

While these instances can not serve as precedents for determining what became of the crown land of the Tuimanua, nevertheless, they do show what, in these particular instances, property owned by a king as a king was vested in the succeeding government. However, in none of these cases was property which was owned by the king as a private individual vested in the succeeding government.

██ ██ We think that when the kingdom of the Tuimanua came to an end and the sovereignty of the king (Tuimanua) passed to the United States of America, then, pursuant to the principles of international law, the land Lalo-

pua, being crown property owned by the king in his capacity as king and sovereign, became, as the result of the cession, the property of the United States of America. The deed of cession from Tuimanua Elisara and his chiefs passed the sovereignty over the Manua Islands to the United States of America. The general rule of international law is that, unless otherwise stated in a treaty of cession, private property remains private property but the title to public property and crown property vests in the new sovereign. See I Moore's Digest of International Law, p. 281; I Hyde's International Law (2d Rev. Ed.), p. 381; 12 A.J. I.L. 475. The United States of America became the new sovereign.

Instances can be found in various treaties of cession between the United States and other countries in which public and crown property became the property of the United States. The treaty of cession between France and the United States, April 1803, ceding Louisiana, provided that the cession "included the designated lands belonging to Louisiana, all public lots and squares, vacant lands, and all public buildings, fortifications, barracks and other edifices which are not private property. . . ." The treaty of cession between Spain and the United States, 22 February 1819, ceding Florida provided that the cession included "the designated islands dependent on said provinces, all public lots and squares, vacant land, public edifices . . . which are not private property." The treaty of cession between the United States and Russia, 30 March 1867, ceding Alaska declared that the cession included "the right of property in all public lots and squares, vacant land and all public buildings . . . which are not private individual property." The cession of the Danish West Indies from Denmark to the United States in 1916 provided that "This cession includes the right of property in all public, government, or crown lands. . . ."

The cession of Manua to the United States in 1904 in no way affected private land titles. Land which was the property of a matai title prior to the cession remained the property of the same matai title after the cession. When the sovereignty of a country is transferred, the inhabitants are protected in the possession of their private property and such is the law of nations. "The cession of a territory by its name from one sovereign to another, conveying the compound idea of surrendering at the same time the lands and the people who inhabit them, would be necessarily understood to pass the sovereignty only and not to interfere with private property." Chief Justice Marshall in the *United States v. Percheman*, 32 U.S. 51, 7 Pet. 51, 8 L.Ed. 604, 617. A cession does not impair the rights of private property. Such rights are consecrated by the law of nations. *United States v. Juan Moreno*, 68 U.S. 400, 1 Wall. 400, 17 L.Ed. 633, 635.

It is our conclusion from the evidence that the land Lalopua also includes a small piece of land known as Lalovi (designated as such in the northeast corner of the survey) and that as a part of Lalopua it also became the property of the United States upon the cession of the Islands, it being crown land.

The survey shows that the surveyed tract includes .747 of an acre slightly less than three-quarters of one acre. Lalopua and Lalovi together make up approximately one-half of the surveyed tract and consequently they have an area of about three-eighths of an acre. The remainder of the surveyed tract is made up of the land Avasii.

We do not believe that the crown land Lalopua (including Lalovi) passed to the government of American Samoa upon the cession of the Islands since the cession was to the United States of America and not the Government of American Samoa. The succeeding sovereign was the United States of America, not the Government of Ameri-

can Samoa. Lands in Hawaii which belonged to the sovereign passed to the United States as part of the public domain on the annexation of those islands by the United States. *Liliuokalani v. United States*, 45 C.Cl. 418.

■ Section 905 of the Code provides that no land shall be registered unless the description clearly identifies the boundaries of the land by metes and bounds." We are unable to determine from the survey and the evidence precisely the location of the boundary between Avasii and Lalopua (including Lalovi). We are satisfied from the evidence, however, that such boundary is a line crossing the surveyed tract and lying about eight or ten feet west of the Tuimanua graves (as marked on the survey) with a bearing of approximately eight degrees West of North (i.e. approximately parallel to the eastern boundary of the surveyed tract).

Being unable to determine the exact location of the boundary between Avasii and Lalopua (including Lalovi) we cannot order the registration of any part of the surveyed tract, as above stated, since Sec. 905 of the Code requires that the description of registered land clearly identify "the boundaries of the land by metes and bounds." Consequently our decree must be limited to what shall be done with the application of Taliutafa to have the surveyed tract registered as the communal family land of the Taliutafa title. Our conclusion is that it should be denied.

### DECREE

Accordingly it is ORDERED, ADJUDGED and DECREED that the application of Taliutafa to have the surveyed tract (described by him as Lalopua in the survey accompanying the application) registered as the communal family land of the Taliutafa title be and the same is hereby denied.

The Registrar of Titles will be advised of this decree.

Costs aggregating $210.00 are hereby assessed against Taliutafa, Sotoa, Mulu and Laolagi, each to pay $52.50 within sixty days.